## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CRAIG LENELL, et al. | : CIVIL ACTION |
| Plaintiffs, | : |
| v. | : 2:14-cv-01924-LDD |
| | : |
| ADVANCED MINING TECHNOLOGY, INC., et al. | : |
| Defendants. | : |

## O R D E R

AND NOW, this      day of            2014, Upon consideration of the Motion to

Dismiss for lack of subject matter jurisdiction filed by Defendants pursuant to Federal Rule of

Civil Procedure 12(b)(1), the accompanying Memorandum of Law, supporting Declaration of

Joshua Zipkin and all papers, if any, filed in opposition, and for good cause shown, it is hereby

**ORDERED** that Defendants' Rule 12(b)(1) Motion to Dismiss for lack of subject matter

jurisdiction is **GRANTED**; and it is

**FURTHER ORDERED** that a copy of this Order shall be served upon all parties.

IT IS SO ORDERED.

_____

                                                                        J.

13979550v.1

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CRAIG LENELL, et al. | : CIVIL ACTION |
| Plaintiffs, | : |
| | : 2:14-cv-01924-LDD |
| v. | : |
| | : |
| ADVANCED MINING TECHNOLOGY, INC., | : |
| et al. | : |
| | : |
| Defendants. | : |

## DEFENDANTS' MOTION TO DISMISS THE PLAINTIFFS'
## FIRST AMENDED COMPLAINT

Defendants Advanced Mining Technologies, Inc., Joshua Zipkin and Jim Brown, by and through their undersigned attorneys, White and Williams LLP, move to dismiss the First Amended Complaint [ECF No. 17] of plaintiffs Craig Lenell, Thomas Urbanek, Jared Pela, Timothy Christian, John Lewis and Philip Wiltshire pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction under the Class Action Fairness Act since the amount in controversy is under Five Million Dollars.

The reasons for the motion are set forth in the Memorandum of Law of Defendants in Support of their Motion to Dismiss and the Declaration of Joshua Zipkin.

Respectfully submitted,

WHITE AND WILLIAMS LLP

BY:   s/Primitivo J. Cruz
        Michael N. Onufrak
        Primitivo J. Cruz
        1650 Market Street | One Liberty Place,
        Suite 1800 |
        Philadelphia, PA  19103-7395
        Phone: 215.864.7174/6865
        Attorneys for Defendants

Dated:  July 17, 2014

13979550v.1

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| CRAIG LENELL, et al. | CIVIL ACTION |
| Plaintiff, | 2:14-cv-01924-LDD |
| v. | |
| ADVANCED MINING TECHNOLOGY, INC., et al. | |
| Defendants. | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
MOTION TO DISMISS THE PLAINTIFFS' FIRST AMENDED COMPLAINT FOR
LACK OF SUBJECT MATTER JURISDICTION**

**I.     PRELIMINARY STATEMENT**

Defendants Advanced Mining Technologies, Inc. ("AMT"), Joshua Zipkin ("Zipkin") and Jim Brown ("Brown") respectfully submit this memorandum of law in support of their motion to dismiss the First Amended Complaint filed by Plaintiffs Craig Lenell ("Lenell"), Thomas Urbanek ("Urbanek"), Jared Pela ("Pela"), Timothy Christian ("Christian"), John Lewis ("Lewis") and Philip Wiltshire ("Wiltshire") (collectively "Plaintiffs") pursuant to Rule 12 (b)(1) of the Federal Rules of Civil Procedure for lack of subject matter jurisdiction.

Plaintiffs are miners who contracted with AMT for the purchase of Bitcoin Miners. Bitcoin Miners are specialized computers that allow a miner to participate in the decentralized virtual currency network known as bitcoin. Plaintiffs aver that AMT breached their respective contracts by failing to deliver Bitcoin Miners within AMT's estimated delivery window.  Further, Plaintiffs assert class allegations on behalf of "hundreds" of AMT customers alleged to have similar claims against AMT due to delayed orders.  Plaintiffs vaguely allege these orders are in the "millions of dollars." However, Plaintiffs cannot satisfy the requirements for subject matter jurisdiction under the Class Action Fairness Act of 2005, 28 U.S.C. § 1332 because Plaintiffs cannot prove that the

aggregate amount in controversy exceeds $5,000,000. Plaintiffs' mere conclusory statement that class members incurred "millions of dollars" in damages "exceeding $5,000,000" does not satisfy their burden for the following reasons:

First, AMT's sales records,[1] contradict Plaintiffs' allegation because the amount of any outstanding orders only totals $ 973,959.12. Second, any purported lost profits from "loss in opportunity to mine bitcoin" are excluded under the Terms of Sale between AMT and its miners. Third, the volatility inherent in the bitcoin market itself makes the valuation of such lost profits too speculative to allow for lost profits recovery as a matter of law. Fourth, Plaintiffs' potential recovery of additional special or exemplary damages under state consumer laws is not countable towards the CAFA threshold since plaintiffs admittedly are not consumers, and divergent state law consumer claims are not capable of being certified as a federal class action.

For these reasons, as discussed more fully below, all of Plaintiffs' claims should be dismissed for lack of subject matter jurisdiction.

## II.   STATEMENT OF FACTS

### A.   Summary of Plaintiff's Claims

Plaintiffs Lenell, Urbanek and Pela filed their Complaint on April 2, 2014 alleging ten common law and statutory causes of action against Defendants. See Compl., at ¶ 12 (April 2, 2014) [ECF No. 1] (summarizing the ten causes of action originally asserted by Plaintiffs). On July 2, 2014, Plaintiffs' filed their First Amended Complaint in response to the Motion to Dismiss filed by Defendants on June 16, 2014. See Pl. First Am. Compl. (July 2, 2014) [ECF No. 17]. The First Amended Complaint also added Christian, Lewis and Wiltshire as additional plaintiffs. See id. at ¶ 12, 25-38 (identifying the three additional plaintiffs and summarizing the fourteen causes of action raised in the First Amended Complaint).

---

[1] In support of their motion, Defendants have submitted the Declaration of Joshua Zipkin, AMT's CEO. See Declaration of Joshua Zipkin (July 17, 2014), attached hereto as Exhibit "A". The Declaration describes the relevant AMT sales from U.S. customers, in addition to attaching a summary outlining relevant customer data.

The underlying controversy surrounds Plaintiffs' purchase of Bitcoin Miners from AMT. In their First Amended Complaint Plaintiffs' allege AMT is liable for purported breaches of contract and express warranty arising from AMT's delayed delivery of Bitcoin Miners within certain delivery windows. See id. at ¶¶ 1-6; 127-37. Further, while the Plaintiffs now also allege that the Bitcoin Miners received by class members do not perform as warranted, none of the Plaintiffs aver that they received a Bitcoin Miner to merit such a claim. See id. at ¶¶ 72, 77, 84, 89, 94, 101 (noting that the named Plaintiffs all allege they never received a Bitcoin Miner). Plaintiffs further allege Defendants are liable under tort/restitution principles for Common Law Fraud, Negligent Misrepresentation, Breach of Implied Duty of Good Faith and Fair Dealing, and Unjust Enrichment. See id. at ¶¶ 138-60. Last, Plaintiffs allege that the Defendants' marketing and sale of Bitcoin Miners violated the consumer protection laws of Pennsylvania, North Carolina, Florida, Utah, Oregon, California and Illinois. See id. at ¶¶ 161-219.

Plaintiffs, on their own behalf and on behalf of other similarly situated U.S. customers of AMT, assert that this Court's subject matter jurisdiction arises under the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332. See id. at ¶ 46. However, Plaintiffs' jurisdictional statement is a mere conclusory recitation of CAFA's required thresholds stating: "(i) there are 100 or more class members, (ii) there is an aggregate amount in controversy exceeding $5,000,000, excluding interest and costs, and (iii) there is minimal diversity because at least one plaintiff and one defendant are citizens of different states." See id. While Plaintiffs aver their belief that hundreds of U.S. AMT customers exist and that these putative class members have "millions of dollars" in damages, Plaintiffs admit that this information only can be confirmed by AMT's records. See Pl. First Am. Compl., at ¶¶ 120-21, 125. Plaintiffs have not pled any other basis for asserting this Court's jurisdiction under either federal question or diversity grounds.

Plaintiffs allege that their proposed class consists of [a]ll persons in the United States and the world who purchased AMT Bitcoin Miners and never received the AMT Bitcoin Miner,

- 4 -

untimely received the AMT Bitcoin Miner, or received an AMT Bitcoin Miner that did not perform as advertised (the "Nationwide Class"). Id. at ¶ 118. Alternatively, Plaintiffs allege seven sub-classes of persons who purchased AMT Bitcoin Miners and never received, untimely received the AMT Bitcoin Miner, or received an AMT Bitcoin Miner that did not perform as advertised from the states of (i) Pennsylvania, (ii) North Carolina, (iii) Florida, (iv) Utah, (v) Oregon, (vi) California and (vii) Illinois, respectively. Id.

Plaintiffs allege that they, and putative class members, incurred "millions of dollars" in damages in the form of: (a) compensatory damages for amounts Plaintiffs paid AMT for Bitcoin Miners, but which remain undelivered or un-refunded, (b) consequential damages for Plaintiffs' lost profits from an alleged "lost opportunity to mine bitcoins" while the orders went unfulfilled, and (c) special, statutory, punitive or other exemplary damages or awards provided under various state law statutory causes of action pled in the First Amended Complaint. See id. at ¶¶ 72, 77, 84, 89, 94, 101, 122-23.

### B.   Summary of AMT's Business and U.S. Customers

Since September of 2013, AMT engaged in the business of selling specialized computer hardware developed for use in mining bitcoin. Declaration of Joshua Zipkin, at ¶ 3 (July 17, 2014), attached hereto as Exhibit "A". Since the company's inception, AMT worked with several chip manufacturers to develop AMT-branded Miners. Id. at ¶ 5. Unlike a typical PC, AMT's Miners incorporate application specific integrated circuit (ASIC) chips specially made for bitcoin mining. Id. at 5-6. These ASIC chips are designed to efficiently perform transactions from the Bitcoin network in a process commonly referred to as "hashing." Id. at 5.

To date, AMT received 183 accepted orders from 158 U.S. customers for a total of 219 Miners ordered. AMT satisfied 45 of those orders, refunded three and settled one small claims case. Id. at ¶ 10. However, AMT still has 135 outstanding orders from 119 U.S. miners. See Ex. A at ¶ 5, 11-14. Each miner entered into a contract with AMT by accepting AMT's Terms of Sale,

which were presented to each miner at the time of order and no order would be processed without a miner's acceptance of these terms. See id. at ¶ 10; AMT Terms of Sale, attached hereto as Exhibit "One".

The sum of the amounts paid by these 119 U.S. miners totals $ 973,959.12. Ex. A at ¶ 5. These 119 customer orders remain outstanding due to unexpected delays caused by one of AMT's chip suppliers, Bitmine AG, and subsequent unforeseen issues arising when attempting to resolve these delays. See id. at ¶¶ 11-14. However, notwithstanding these problems, AMT continued to fill orders as AMT is able, and is working on solutions towards resolving all of its outstanding orders in the near future. Id. at ¶¶ 15-17.

### C. The Process of "mining" bitcoin.

Bitcoin is a "decentralized peer-to-peer payment network" powered by users on a network, known as "miners" who collectively process bitcoin transactions without a central authority or middleman. See Frequently Asked Questions: General, BITCOIN.ORG, https://bitcoin.org/en/faq#general (last visited June 9, 2014).[2] "Mining" is the process by which miners on the network spend computing power to process transactions, secure the network and keep everyone in the system synchronized. See Frequently Asked Questions: Mining, BITCOIN.ORG, https://bitcoin.org/en/faq#mining (last visited June 9, 2014). Bitcoin transactions are broadcast through the network and each "miner" attempts to process and confirm these transactions. See id. Bitcoin miners perform this work in order to earn (i) transaction fees and (ii) newly created bitcoins. See id.

### 1. The difficulty and random variance entailed in "mining" bitcoin rewards.

For a miner to successfully confirm a transaction and find a "block" for a bitcoin reward, she must be the first miner, to find and publish a mathematical proof of work. See Frequently Asked Questions: Mining, BITCOIN.ORG, https://bitcoin.org/en/faq#mining (last visited June 9,

---

[2] Bitcoin.org is the original domain name for the first Bitcoin website and is registered and managed by Bitcoin's original developers. About bitcoin.org, BITCOIN.ORG (June 9, 2014), https://bitcoin.org/en/about-us.

2014). Such proofs are very hard to generate because there is no way to create them other than by randomly attempting billions of calculations per second using specialized bitcoin hardware and software. See id. Further, if someone else finds a bitcoin "block" first, she gets the reward, while other miners must move on and attempt to find new blocks without any compensation for their efforts. See id. ("The proof of work is also designed to depend on the previous block to force a chronological order in the block chain. . . . When two blocks are found at the same time, miners work on the first block they receive and switch to the longest chain of blocks as soon as the next block is found."). As more miners start to mine, the difficulty of finding blocks automatically is increased by the network to ensure that the average time to find a block remains equal to ten minutes. See id. As a result, mining is a competitive exercise in the sense that all miners on the network compete to find and submit the same "blocks" simultaneously, but no individual miner can control whether she will be the first miner to discover a block and claim a bitcoin reward. See id.

The difficulty of mining described above generated two methods of bitcoin mining, "solo" mining and "pooled" mining. "Solo mining" requires a miner to generate new blocks on her own, "with the proceeds from the block reward and transaction fees going entirely to herself, allowing her to receive large payments with a higher variance (longer time between payments)." See Bitcoin Developer Guide: Mining, BITCOIN.ORG, https://bitcoin.org/en/developer-guide#mining (last visited June 9, 2014). "Pooled mining" is where a miner pools resources with other miners to find blocks more often, "with the proceeds being shared among the pool miners in rough correlation to the amount of hashing power they each contributed, allowing the miner to receive small payments with a lower variance (shorter time between payments)." Id.

Mining pools developed because "the difficulty for mining increased to the point where it could take years for slower miners to generate a block." See Bitcoin Mining Pools, BITCOINMINING.COM, http://www.bitcoinmining.com/bitcoin-mining-pools/ (last visited June 9,

2014). These mining pools then distribute bitcoins awarded to the pool according to "shares" earned by individual miners that generally correlate to the amount of work an individual miner contributed to the pool. Mining pools use various methods to calculate "payments" to pool members and each pool is still subject to a measure of luck in the frequency of finding blocks. See id.; see also Comparison of mining pools, BITCOIN WIKI (June 6, 2014, 6:02 PM), https://en.bitcoin.it/wiki/Comparison_of_mining_pools (listing thirty-six mining pools available internationally, and describing the eleven methods mining pools use to calculate and distribute rewards to pool members). Accordingly, even pooled miners remain subject to the network's inherent randomness in earning bitcoins for their work, notwithstanding their united efforts to lower the variance for a decreased share of the bitcoin reward.

## III.   ARGUMENT

### A.   <u>Standard of Review</u>

A party may move for dismissal pursuant to Rule 12(b)(1) based on lack of subject matter jurisdiction. Gould Electronics, Inc. v. U.S., 220 F.3d 169, 176-79 (3d Cir. 2000). "When subject matter jurisdiction is challenged under rule 12(b)(1), the plaintiff must bear the burden of persuasion." Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1409 (3d Cir.1991).

A Rule 12(b)(1) motion may be treated as either a facial or factual challenge to the court's subject matter jurisdiction. Gould Electronics, 220 F.3d at 176 (citing Mortensen v. First Fed. Sav. and Loan Ass'n, 549 F.2d 884, 891 (3d Cir.1977)). "In reviewing a factual attack, the court may consider evidence outside the pleadings." Gould Electronics, 220 F.3d at 176 (citing Gotha v. United States, 115 F.3d 176, 178–79 (3d Cir. 1997)). A jurisdictional challenge is a factual challenge if "it concerns not an alleged pleading deficiency, but rather the actual failure of [plaintiff's] claims to comport with the jurisdictional prerequisites." U.S. ex rel. Atkinson v. PA. Shipbuilding Co., 473 F.3d 506, 514 (3d Cir. 2007).

A district court may grant a Rule 12(b)(1) motion for lack of subject matter jurisdiction based on the legal insufficiency of a claim so long as the claim "clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or ... is wholly insubstantial and frivolous." Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1408–09 (3d Cir.), cert. denied, 501 U.S. 1222 (1991) (quoting Bell v. Hood, 327 U.S. 678, 683 (1946)).

In the present case, Defendants challenge whether the amount of alleged damages is sufficient to meet the jurisdictional threshold set by the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332 (2005). Defendants assert that Plaintiffs' claims do not "comport with the jurisdiction prerequisites" of CAFA. See Atkinson, 473 F.3d. at 514. Accordingly, under Rule 12(b)(1), this Court is "permitted to make factual findings, beyond the pleadings, that [a]re decisive to determining jurisdiction" over Plaintiffs' purported claims.[3] CNA v. United States, 535 F.3d 132, 145 (3d Cir. 2008) (citing Atkinson, 473 F.3d at 514).

### B. Plaintiffs' First Amended Complaint Should Be Dismissed Pursuant to 12(b)(1) for Failing to Meet the Jurisdictional Requirements under the Class Action Fairness Act ("CAFA").

Plaintiffs' First Amended Complaint must be dismissed because this Court does not have subject matter jurisdiction over this alleged nationwide class action under section 1332 of the Class Action Fairness Act. See Pl. First Amended Compl., at ¶ 46 [ECF No. 17]. CAFA grants federal courts original jurisdiction over actions in which: (1) the matter constitutes a "class action"; (2) "the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs"; (3) CAFA's minimal diversity requirements are met; and (4) there are at least 100 members

---

[3] When considering 12(b)(1) motions raising factual challenges, the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case because the issue is "the trial court's . . . very power to hear the case." Mortensen, 549 F.2d at 891. "In short, no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." Id. The court may determine jurisdiction by weighing the evidence presented by the parties and in the event a dispute of a material fact exists, the court must conduct a plenary trial on the contested facts prior to making a jurisdictional determination. See Gould Electronics, 220 F.3d at 177 (citing Int'l Ass'n of Machinists & Aerospace Workers v. Northwest Airlines, Inc., 673 F.2d 700, 711-12 (3d Cir. 2000)).

of the putative class. 28 U.S.C. § 1332(d)(2), (d)(5)(B). Further, CAFA requires that "the claims of the individual class members shall be aggregated to determine whether the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs." See Kaufman v. Allstate New Jersey Ins. Co., 561 F.3d 144, 151 (3d Cir. 2009); 28 U.S.C. § 1332(d)(6).

Defendants' challenge to jurisdiction is premised on the proposition that the amount in controversy in Plaintiffs' lawsuit cannot exceed $5 million when aggregating the claims of individual class members. The Third Circuit calls for the use of the preponderance of the evidence standard as set forth by the Supreme Court in McNutt v. General Motors Acceptance Corp. of Indiana, 298 U.S. 178, (1936), when assessing issues involving factual disputes as to the amount in controversy under CAFA. See Frederico v. Home Depot, 507 F.3d 188, 197 (3d Cir. 2007) (citing SamuelBassett v. KIA Motors Am., Inc., 357 F.3d 392, 397 (3d Cir. 2004)).

Under McNutt, a District Court, in determining the amount in controversy, "may ... insist that the jurisdictional facts be established or the case be dismissed, and for that purpose the court may demand that the party alleging jurisdiction justify his allegations by a preponderance of the evidence." 298 U.S. at 189.  Thus, because the facts surrounding the amount in controversy are in dispute in the instant matter, Plaintiffs must justify their allegations as to the amount in controversy by a preponderance of the evidence. McNutt, 298 U.S. at 189; Samuel–Bassett, 357 F.3d at 397.

In other words, Plaintiffs must show, based on the allegations in their First Amended Complaint and any factual record on jurisdictional issues before the Court, that it is more likely than not that the aggregate of their proposed claims will meet or exceed $5,000,000. 28 U.S.C. § 1332(d) (2) & (d)(6); McNutt, 298 U.S. at 189; Standard Fire Ins. Co. v. Knowles, 2013 WL 1104735, at *3 (2013) ("[T]he [CAFA] statute tells the District Court to determine whether it has jurisdiction by adding up the value of the claim of each person who falls within the definition of [the plaintiff's] proposed class and determine whether the resulting sum exceeds $5 million.").

- 10 -

13979550v.1

Contrary to the allegations in the First Amended Complaint, Plaintiffs cannot establish that the aggregate damages for the proposed class members' claims exceeds the $5,000,000 threshold under any factual scenario. First, Plaintiffs' claims, whether in contract or tort, seeking compensatory damages for the sums paid by proposed class members to AMT do not aggregate more than $973,959.12. See Decl. of Joshua Zipkin, at ¶ 10. Moreover, while Plaintiffs now try to inflate this number by claiming certain delivered Bitcoin Miners do not perform as warranted, all of the Plaintiffs aver that they never received their Bitcoin Miner, and thus, their claims are atypical of, and do not support such allegations. See id. at ¶¶ 72, 77, 84, 89, 94, 101. Second, Plaintiffs' claims for consequential damages from purported lost profits from "loss in opportunity to mine bitcoin" are not recoverable as a matter of law  because the Terms of Sale between AMT and proposed class members' expressly limits liability to the contractual amounts paid by customers and precludes liability for lost profits. Zipkin Declaration at ¶ 10; AMT Terms of Sale. Third, Pennsylvania law precludes any recovery of lost profits when the assessment of lost profits would be speculative.  That is the situation here due to the inherent random nature of the bitcoin mining process, the experimental nature of the bitcoin system itself and the widely acknowledged volatility in the market for bitcoins.  Fourth, any special damages, punitive damages, exemplary damages or attorney's fees sought under the statutory consumer protection laws of Pennsylvania, North Carolina, Florida, Utah, Oregon, California or Illinois do not count towards the CAFA threshold since plaintiffs are not consumers and courts in this district routinely deny class certification where it is necessary to apply numerous states' consumer protection laws to one case. For these reasons, as more fully described below, Plaintiffs' cannot satisfy the $5,000,000 threshold required under CAFA.

1.   **Compensatory damages for the contractual amounts paid by Plaintiffs' do not satisfy the $5,000,000 aggregate threshold under CAFA.**

Defendants' sales records confirm that AMT only received 183 orders from 158 United States customers for the purchase of Bitcoin Miners. AMT satisfied 45 of these orders. Given this information, at best only 119 of AMT's customers could potentially be members of the proposed class.

According to AMT's sales records, the amount paid by the 119 potential class members (including named Plaintiffs) only totals $ 973,959.12. AMT's aggregate liability cannot exceed this amount, whether sought in contract or in tort. Thus, on this basis alone, Plaintiffs cannot establish the necessary aggregate damages of $5,000,000 under CAFA for the proposed Nationwide Class, much less the alternative four state subclasses it proposes for customers from Pennsylvania, North Carolina, Florida, Utah, Oregon, California and Illinois.

When presented with these facts, Plaintiffs attempted to amend their original Complaint to make immaterial and unsupported allegations solely meant to obtain jurisdiction. First, Plaintiffs' attempted to expand the "Nationwide Class" in their First Amended Complaint to include all AMT customers in "the world." However, this attempt to expand the jurisdictional amount fails because AMT already asserted that it filled all of its non-U.S. orders, and in fact, declared so in response to Plaintiffs' initial Complaint. Second, Plaintiffs try to increase the potential amount of compensatory damages by now also alleging that the Bitcoin Miners received by class members do not perform as warranted. However, none of the Plaintiffs aver that they received a nonperforming Bitcoin Miner to merit such a claim, and thus, fail to state any claim for relief on such grounds. See id. at ¶¶ 72, 77, 84, 89, 94, 101 (representing that all of the named Plaintiffs aver they never received a Bitcoin Miner). These attempts by Plaintiffs are solely made to increase the compensatory damages beyond $ 973,959.12 arguably in controversy and make a federal case out of one which is not, but these new claims are not supported by the facts and have no merit towards

satisfying jurisdiction over Plaintiffs' claims in the First Amended Complaint. See Kehr Packages,

926 F.2d at 1408–09 (acknowledging that "immaterial" claims made to "obtain jurisdiction" allow

a court to reach the legal insufficiency of a claim under a Rule 12(b)(1) jurisdictional attack).

> **2.    Plaintiffs' contracts with AMT expressly preclude recovery of damages in the
> form of lost profits and limit AMT's liability to the price of the products
> purchased.**

In addition to the contractual amounts sought by Plaintiffs as compensatory damages,

Plaintiffs also ask for consequential damages in the form of lost profits, or "loss in opportunity to

mine bitcoins." However, these alleged lost profits cannot be included in determining the

$5,000,000 threshold because such damages are expressly excluded by the terms of Plaintiffs'

contracts with AMT.

Under Pennsylvania law, provisions in contracts that exclude liability for special,

consequential, incidental, and indirect damages are enforceable. New York State Elec. & Gas

Corp. v. Westinghouse Elec. Corp., 564 A.2d 919, 924 (Pa. Super. Ct. 1989); accord Peerless Wall

and Window Coverings, Inc. v. Synchronics, Inc., 85 F. Supp.2d 519, 528 (W.D. Pa. 2000)

(finding limitation clause set off by large, bold type to be clear and enforceable). Pennsylvania

courts will enforce limitation of liability clauses, regardless of whether the damages are pled in

contract or tort, when they are reasonable and do not completely exonerate parties from liability

for gross negligence or intentional acts. Youtie v. Macy's Retail Holding, Inc., 653 F. Supp.2d 612,

630 (E.D. Pa. 2009); see also Valhal Corp. v. Sullivan Assocs., Inc., 44 F.3d 195, 202-03 (3d Cir.

1995).

Limitations on liability help allocate unknown or indeterminable risks, and consequently

they are "a fact of everyday business and commercial life." Id. at 204 (citing K & C, Inc. v.

Westinghouse Elec. Corp., 263 A.2d 390, 393 (Pa. 1970)); accord LoBianco v. Property

Protection, Inc., 292 Pa.Super. 346, 437 A.2d 417 (1985) (clause limiting liability of security alarm

company upheld against owner whose home was burglarized); Eimco Corp. v. Joseph Lombardi

- 13 -

& Sons, 193 Pa.Super. 1, 162 A.2d 263, 266 (1960) (manufacturer's limitation of liability enforced

against buyer-contractor); Magar v. Lifetime, 187 Pa.Super. 143, 144 A.2d 747, 748 (1958) (alarm

installer's limitation of liability enforced against private homeowner).

Here, the express language of the Terms of Sale precludes liability for consequential

damages and limits AMT's aggregate liability to the purchase price of the product. The Limitation

of Liability clause in the Terms of Sales provides:

> IN NO EVENT SHALL AMT'S AGGREGATE LIABILITY FOR
> ANY BREACH, WARRANTY, INDEMNITY OR OTHER
> OBLIGATION OR LIABILITY ARISING OUT OF OR IN
> CONNECTION WITH THE SALE OF PRODUCT(S) OR
> SERVICES HEREUNDER OR THE USE OF ANY AMT
> PRODUCT PROVIDED HEREUNDER, EXCEED THE
> PURCHASE PRICE OF THE PARTICULAR PRODUCT(S) OR
> SERVICES WITH RESPECT TO WHICH LOSSES OR
> DAMAGES ARE CLAIMED[.] IN NO EVENT SHALL AMT BE
> LIABLE FOR SPECIAL, INCIDENTAL OR CONSEQUENTIAL
> DAMAGES OF ANY NATURE WHATSOEVER (INCLUDING,
> BUT NOT LIMITED TO, LOSS OF PROFITS, LOSS OF USE
> AND LOSS OF GOODWILL), REGARDLESS OF WHETHER
> AMT HAS BEEN GIVEN NOTICE OF ANY SUCH ALLEGED
> DAMAGES, AND REGARDLESS OF WHETHER SUCH
> ALLEGED DAMAGES ARE SOUGHT UNDER CONTRACT,
> TORT OR OTHER THEORIES OF LAW.

Plaintiffs, and potential class members, accepted these terms at the time they made their

purchase, each was presented with the Terms of Sale before submitting their orders and the terms

are publically available on AMT's website. The contract between AMT and its customers does not

allow for the consequential damages that Plaintiffs now demand.  Acknowledging the legal

insufficiency surrounding the purported lost profits pled in the First Amended Complaint,

Plaintiffs' consequential damages claim clearly appears to be "immaterial," "made solely for the

purpose of obtaining jurisdiction," or otherwise "wholly insubstantial and frivolous." Kehr

Packages, 926 F.2d at 1408-09 (acknowledging circumstances in which a court may reach the legal

insufficiency of a claim in a jurisdictional attack under Rule 12(b)(1) motions). Accordingly, on

13979550v.1

this ground alone the Plaintiffs cannot rely on any purported lost profits or "lost opportunity" damages that count towards establishing the $5,000,000 aggregate and satisfy their burden.

>    **3.      Any alleged "lost opportunity" to mine bitcoin is too speculative to permit recovery as damages as a matter of law.**

In addition to the contractual limitation precluding Plaintiffs' recovery of alleged lost profits as consequential damages, any attempt at calculating the putative class's "loss in opportunity to mine bitcoins" would be too speculative due to the unpredictability of the bitcoin mining process and the volatile nature in the secondary market for bitcoin-currency exchanges.

When a business is "new and untried, courts have declared the measure of anticipated profits too speculative to provide a basis for an award of damages." Delahanty v. First Pennsylvania Bank, N.A., 464 A.2d 1243, 1258 (Pa. Super. 1983) (citing Exton Drive-In, Inc. v. Home Indemnity Co., 261 A.2d 319 (Pa. 1969)); see also Platou v. Swanton, 230 N.W. 725 (N.D. 1930); Carpenters' Local 1686 v. Wallis, 237 P.2d 905 (Okla. 1951); Richker v. Georgandis, 323 S.W.2d 90 (Tex.Civ.App.1959). As recognized in Delahanty, courts are reluctant to award lost profits except when the business concerned is established.  Most courts require that plaintiff show a record of prior profitability to support damages to a reasonable certainty. Delahanty, 464 A.2d at 1260-61 (rejecting lost profits damages where there was no record of profitability prior to the alleged breach of contract and the asserted lost profits were only supported by plaintiffs' estimations and projections from industry-wide statistics).

Here, Plaintiffs claim a right to recover lost profits for a "loss in opportunity" to mine bitcoins.  Plaintiffs assert they are entitled to lost profits for any bitcoin they could have mined beginning from the time that AMT estimated a Bitcoin Miner would be delivered.  At no point in their First Amended Complaint do Plaintiffs allege that they, or any proposed class member, had a record of prior profitability from mining prior to the alleged breach by AMT. See, e.g., Pl. First Am. Compl., at ¶¶ 62-72, 73-77, 78-84, 85-89, 90-94, 95-101, 123-24 [ECF No. 17] (outlining

factual allegations specifically pertaining to the named Plaintiffs and the proposed class, but which omit reference to any record of profitability prior to the alleged breach).  Rather, Plaintiffs set forth mere conclusory statements or industry anecdotes such as (i) broadly stating that bitcoin mining is a "very competitive business," (ii) admonishing that it is "critical" that potential market entrants who seek to make a profit from bitcoin mining "begin the process as soon as possible," and (iii) citing an arbitrary, single-day valuation of $561.13  for an exchange of bitcoin into U.S. Dollars as support for the intrinsic value or profit potential from bitcoin speculation. See, e.g., id., at ¶¶ 2, 11, 48-49, 117.  However, such cursory assertions and generalizations about the competitiveness or possible profit from bitcoin mining do not support a claim that Plaintiffs or class members incurred a calculable loss in profits or had a history of profitability, which would allow a Court to assess damages.

The dearth of factual allegations regarding Plaintiffs' alleged lost profits, in their otherwise lengthy, 219-paragraph First Amended Complaint, can be explained by two aspects of the bitcoin network.  First, Plaintiffs can never establish how much bitcoin any particular customer would hypothetically have mined  within a certain period due to the random nature in which the bitcoin network awards miners with bitcoin. See supra Part II.C (describing the randomness inherent in the process by which miners "compete" to solve "blocks" in the bitcoin network and the corresponding variance of successfully "earning" an award of bitcoin).  While it is true that increasing the computing power of mining equipment, or joining a pool of miners, may increase their odds of "earning" an award of bitcoin, Plaintiffs are unable to retrospectively calculate how many bitcoins they would have earned in a hypothetical period with any certainty. Thus, the very nature of the arbitrary calculations the bitcoin network requires in order to "earn" bitcoin prevents any reasonable means of discerning how much "loss in opportunity" a potential class member may or may not have experienced and how many bitcoins are associated with an alleged loss.

Second, even if Plaintiffs could establish the number of bitcoins that a proposed miner would have earned within a prescribed period, the experimental and volatile nature of the bitcoin market precludes any attempt at accurately assessing lost profits as a form of damages. The core developers of the bitcoin system openly acknowledge that bitcoin is a "*high risk asset*" and "[t]"he price of bitcoin can unpredictably increase or decrease over a short period of time due to its *young economy, novel nature, and sometimes illiquid markets.*" See Some Things You Need to Know: Bitcoin price is volatile, BITCOIN.ORG, https://bitcoin.org/en/you-need-to-know (last visited June 9, 2014) (emphasis added). Further, the bitcoin system developers go on to advise new entrants that bitcoin is an "*experimental new currency*" and those seeking to enter the field should know that it is a "*new invention* that is exploring ideas that have *never been attempted before*." See Some Things You Need to Know: Bitcoin is still experimental, BITCOIN.ORG (June 9, 2014) (emphasis added), https://bitcoin.org/en/you-need-to-know. One federal court has even recognized the novelty of this new market noting that "[t]he value of Bitcoin is volatile and ranges from less than $2 per Bitcoin to more than $260 per Bitcoin." SEC v. Shavers, No. 4:13-cv-416, 2013 WL 4028182, *1 (E.D.Tex. Aug. 6, 2013).

Moreover, bitcoin's novelty, volatility, and experimental nature is further confirmed by economists and experts on monetary policy who commented on the speculative nature of the bitcoin market and the inherent impracticalities in accurately valuing bitcoins as a fungible asset. In December 2013, former Federal Reserve Chairman Alan Greenspan commented on bitcoin stating that unsustainably high prices in bitcoin are a "bubble." Jeff Kerns, *Greenspan Says Bitcoin a Bubble Without Intrinsic Currency Value*, Bloomberg.com (Dec. 4, 2013), http://www.bloomberg.com/news/print/2013-12-04/greenspan-says-bitcoin-a-bubble-without-intrinsic-currency-value.html. Greenspan went on to comment that "[y]ou have to really stretch your imagination to infer what the intrinsic value of Bitcoin is." Id. Economist John Quiggin echoed these statements noting that the present bubble in bitcoin valuation is due to the absence of

- 17 -

any intrinsic value in the currency itself, or value in the form of "fiat money" issued by a government.  John Quiggin, The Bitcoin Bubble and a Bad Hypothesis, The National Interest (April 16, 2013), available at http://nationalinterest.org/commentary/the-bitcoin-bubble-bad-hypothesis-8353. Rather, Quiggin explained that bitcoin's recent history of rising values was based solely on the speculation of market participants' present willingness to accept or hold bitcoin as an asset. Id. ("But in the case of Bitcoin, there is no source of value whatsoever. The computing power used to mine the Bitcoin is gone once the run has finished and cannot be reused for a more productive purpose. If Bitcoins cease to be accepted in payment for goods and services, their value will be precisely zero.")

Based on the variance implicit in the bitcoin network's process for "awarding" bitcoins to miners and the widely acknowledged volatility surrounding the bitcoin market, it would be impossible for Plaintiffs' to calculate any value for "loss in opportunity to mine bitcoins" that would consist of anything more than pure speculation. Pursuant to well-established Pennsylvania law on damages, Plaintiffs are unable to sustain any claim for lost profits.  Moreover, bitcoin's openly acknowledged status as a high-risk asset and experimental new currency is exactly the type of "new and untried" business that Pennsylvania courts declared to be too speculative to allow for measurement of anticipated profits or to provide a basis for an award of damages.  Accordingly, this Court cannot rely on purported consequential damages in evaluating whether Plaintiffs satisfied the $5,000,000 jurisdictional aggregate under CAFA.

4. **Plaintiffs' purported damages arising from state consumer law claims cannot satisfy the $5,000,000 jurisdictional prerequisite.**

In addition to the compensatory and consequential damages claims discussed above, Plaintiffs also pray for relief in the form of special, punitive or other exemplary damages, which presumably arise from state consumer protection laws.  DiGregorio v. Keystone Health Plan East, 840 A.2d 361, 370 (Pa. Super. Ct. 2003) (recognizing that under Pennsylvania law any claim for

punitive, special or exemplary damages is not recoverable for a breach of contract, even if the plaintiff alleges "bad faith" in a breach). However, Plaintiffs' cannot plausibly rely on such alleged damages to reach the required $5,000,000 jurisdictional threshold because the divergent legal issues presented in choosing and applying the proper state law to apply to potential class members precludes certification of such claims as part of the proposed multi-state class. See, e.g., Lyon v. Caterpillar, Inc., 194 F.R.D. 206 (E.D.Pa. 2000) (denying class certification of a nationwide class in a statute-based consumer fraud action because Pennsylvania choice of law analysis would require applying the consumer protection law of each class members' state and divergence of applicable law would predominate over common issues of law or fact). Alternatively, these putative class members are not considered "consumers" under these statutes, and thus, Plaintiffs' cannot not rely on any such alleged damages towards satisfying the CAFA threshold.

In Lyon, plaintiff sought certification for a nationwide class asserting violations of Illinois consumer protection statutes. Id. at 209-10.  The plaintiff in Lyon alleged certification was appropriate because defendant's manufacturing and sales activity took place in Illinois.  Id. at 217. After conducting a thorough analysis under Pennsylvania choice of law principles, the Lyon court refused to certify the plaintiff's class action, which raised statute-based consumer protection claims and involved potential class members across 41 states.  The court in Lyon held that a class action for these claims was not superior to individual litigation because Pennsylvania law precluded blanket application of any one state's law, and instead dictated that the Court must apply the respective state consumer protection law of the 41 states where each potential class member resided. Id. at 218.

Further, the Lyon Court noted that its decision was consistent with other Eastern District of Pennsylvania decisions, which held that "each class member would be subject to the consumer fraud statutes of his or her state of residence because that state would have the paramount interest in applying its laws to protect its consumers." Id. at 218 n.16; see also Truckway Inc. v. General

13979550v.1

Elec., No. 91–0122, 1992 WL 70575, at * 7 (E.D.Pa. March 30, 1992) (concluding that the resolution of the state law issues in a consumer protection act claim would involve the application of the laws of the several states and denying certification); Matjastic v. Quantum Pharmics, Ltd., No. 90–0647, 1991 WL 238304, at *6 (E.D.Pa. July 22, 1991) (explaining that "plaintiff alleges that defendant violated various state consumer fraud laws. The resolution of the state law issues in this count would involve the application of the laws of several states ...." and denying certification).

As recognized by the Lyon Court and others, when a nationwide, federal class action involves numerous consumers residing in a multitude of states, certification of the state consumer protection claims is precluded due to predominance of divergent legal issues over any common issues of law or fact under a Pennsylvania choice of law analysis. The putative class in this lawsuit would involve over one hundred potential class members who reside in 31 states. Plaintiffs cannot rely on purported damages alleged to arise from individual state consumer protection laws towards satisfying the required $5,000,000 jurisdiction since courts in the Eastern District refuse to certify such claims as part of proposed federal class actions.

    a.    **Plaintiffs' specific claims under Pennsylvania, Utah, North Carolina, Florida, Oregon, California and Illinois law would not satisfy the $5,000,000 threshold under CAFA.**

Plaintiffs admit that that they sought to purchase Bitcoin Miners for a business or profit-making purpose.  Thus, no putative class member can assert a claim under the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("PUTPCPL"), the Utah Consumer Sales Practices Act ("UCSPA"), the Oregon Unlawful Trade Practices Law ("OUTPL"), the California Consumer Legal Remedies Act ("CCLRA") or the Illinois Consumer Fraud and Deceptive Trade Practices Act ("ICFA").  Further, even if the few putative class members in North Carolina and Florida could raise viable claims under the North Carolina Unfair and Deceptive Trade Practices Act and Florida Deceptive and Unfair Trade Practices, respectively, the available damages for those fifteen

putative class members would already be included in the potential compensatory damages already accounted for in the Nationwide class.

A claim under the PUTPCPL requires that the goods or services at issue be "primarily for personal, family or household purposes" in order for a claimant to state a cause of action. 73 P.S. § 201-9.2. "The obvious intent of this language is to restrict claims brought under the [PUTPCPL] to those which are legitimately of a consumer nature." Waldo v. North American Van Lines, Inc., 669 F.Supp. 722, 725-26 (W.D.Pa. 1987) In Waldo, the court rejected plaintiff's claims under the PUTPCPL surrounding his purchase of a tractor and corresponding insurance finding that these purchases were "solely for use in his trucking business, and as such they cannot qualify as consumer goods (i.e., food, clothes, household items and the like)." Id. The Waldo court further pointed out that Eastern District Courts also came to similar conclusions when called to interpret PUTPCPL claims and did not apply the statute to business-related transactions. See id. at 726; (citing Merv Swing Agency, Inc. v. Graham Co., 579 F.Supp. 429 (E.D.Pa.1983); Zerpol Corp. v. DMP Corp., 561 F.Supp. 404 (E.D.Pa.1983); Klitzner Industries, Inc. v. H.K. James & Co., 535 F.Supp. 1249 (E.D.Pa.1982); Permagrain Products, Inc. v. U.S. Mat & Rubber Co., 489 F.Supp. 108 (E.D.Pa.1980)).

Similar to the analysis under Pennsylvania's statute, Plaintiffs are legally unable to recover damages under Utah's UCSPA because the Utah statute only applies to consumer transactions for primarily personal, family or household purposes. "The central purpose of the [UCSPA] is 'to protect consumers from suppliers who commit deceptive and unconscionable sales practices.'" Holmes v. American States Ins. Co., 1 P.3d 552, 557 (Utah App. 2000) (quoting Utah Code Ann. § 13–11–2(2)). Thus, defendants are only subject to the UCSPA if they are "suppliers" in a "consumer transaction" as defined by the Act. Id. "'Supplier' means a seller, lessor, assignor, offeror, broker, or other person who regularly solicits, engages in, or enforces consumer transactions, whether or not he deals directly with the consumer." Id. (citing Utah Code Ann. § 13–

- 21 -

11–3(6)). "'Consumer transaction' means a sale, lease, assignment, award by chance, or other written or oral transfer or disposition of goods, services, or other property, both tangible and intangible (except securities and insurance), to a person *for primarily personal, family, or household purposes*. . . ." Id. (emphasis added) (citing Utah Code Ann. § 13–11–3(2)).

Similarly, Oregon's OUTPL and California's CCLRA restricts their application to transactions for that are obtained primarily for "personal, family or household purposes." See Or. Rev. Stat. §§ 646.605(6); 646.607; 646.608 (defining "real estate, good or services" as those obtained for "personal, family or household purposes"); Cal. Civ. Code § 1761(a,d) (defining "goods" subject to the CCLRA as those used "primarily for personal, family or household purposes" and a consumer under the Act as "an individual who seeks or acquires, by purchase or lease, any goods or services for personal, family, or household purposes").

Analogously, Illinois' ICFA defines the term consumer as "any person who purchases or contracts for the purchase of merchandise not for resale in the ordinary course of his trade or business but for his use or that of a member of his household." 815 ILCS 505/1(e). Correspondingly, persons or entities that purchase goods for use in a business are not consumers within the meaning of the ICFA. See Williams Elecs. Games, Inc. v. Garrity, 366 F.3d 569, 579 (7th Cir. 2004) (holding a business purchaser is not a "consumer" under the ICFA because his only use of the purchased product is as an input into making of the product that he sells); First Magnus Fin. Corp. v. Dobrowski, 387 F.Supp.2d 786, 794 (N.D.Ill.2005) (holding a mortgage company was not a consumer and thus could not maintain a claim against a title insurer under the ICFA where the title insurance purchased was for use in the ordinary course of its business). As aptly noted by the Seventh Circuit in Williams:

> the business purchaser is not a consumer, because his only use of
> the purchased product is as an input into the making of a product
> that he sells, in contrast to the individual who consumes a six-pack
> of beer for pleasure or nutrition rather than incorporating the beer
> into a product (his beer belly is not for sale).

<u>Williams Elecs. Games, Inc.</u>, 366 F.3d at 579.

Here, Plaintiffs allege that they sought to purchase Miners from AMT for the purpose of participating in the "very competitive ***business***" of bitcoin mining. <u>See</u> Pl. First Am. Compl., at ¶ 49 (emphasis added).  Plaintiffs further admit that these machines incorporate "application-specific integrated circuit (ASIC) 28mn chips," which are solely designed to process bitcoin-specific transactions. <u>Id.</u> at ¶ 53. At no point do Plaintiffs allege any non-business use for their miners that could be construed as a "personal, family or household purpose" covered by the PUTPCPL, UCSPA, OUTPL, CCLRA or ICFA.  To the contrary, Plaintiffs declare the intended business nature of their use by asserting a claim for damages in the form of alleged lost profits, or a "loss in opportunity to mine bitcoin." <u>See id.</u> at ¶¶ 72, 77, 84, 89, 94, 101. Accordingly, none of the Plaintiffs or potential class members residing in Pennsylvania, Utah, Oregon, California or Illinois have a claim for damages arising under those states' statutes as a matter of law, and Plaintiffs' cannot assert any damages under these purported claims to satisfy CAFA's amount in controversy requirement.

While the North Carolina Unfair and Deceptive Trade Practices Act  ("N.C. UDTPA") may permit recovery to some non-consumers, this statute can only be invoked by potential class members residing in North Carolina. <u>See</u> <u>Shepard v. Bonita Vista Properties, L.P.</u>, 664 S.E.2d 388, 395 (N.C. App. 2008) ("The purpose of G.S. 75-1.1 is to provide a civil means to maintain ethical standards of dealings between persons engaged in business and the consuming public within [North Carolina]  . . . ."); <u>see also</u> <u>Lyon</u>, 194 F.R.D. at 218 n.16  ("[E]ach class member would be subject to the consumer fraud statutes of his or her state of residence because that state would have the paramount interest in applying its laws to protect its consumers."). Only three AMT customers

- 23 -

with outstanding orders reside in North Carolina and the maximum compensatory damages that could be awarded for all of these would be $36,204. However, this sum is already accounted for in the possible compensatory damages available for the entire Nationwide class, and thus, Plaintiffs also cannot rely on this sum towards calculating the $5,000,000 amount in controversy required under CAFA.

While the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") may allow for some private civil causes of action for monetary damages to non-consumers, the maximum allowed is again already considered in the potential compensatory damages for the Nationwide class. With respect to the recovery of damages, FDUTPA provides:

> In any action brought by a person who has suffered a loss as a result of a violation of this part, such person may recover actual damages, plus attorney's fees and court costs as provided in s. 501.2105. However, damages, fees, or costs are not recoverable under this section against a retailer who has, in good faith, engaged in the dissemination of claims of a manufacturer or wholesaler without actual knowledge that it violated this part.

Fla. Stat. § 501.211(2). Thus, a consumer claim for damages under FDUTPA has three elements: (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages. See Chicken Unlimited, Inc. v. Bockover, 374 So.2d 96, 97 (Fla. 2d DCA 1979); Gen. Motors Acceptance Corp. v. Laesser, 718 So.2d 276, 277 (Fla. 4th DCA 1998); Macias v. HBC of Fla., Inc., 694 So.2d 88, 90 (Fla. 3d DCA 1997). The standard for determining the actual damages recoverable under FDUTPA is well-defined in the case law: "[T]he measure of actual damages is the difference in the market value of the product or service in the condition in which it was delivered and its market value in the condition in which it should have been delivered according to the contract of the parties. [ ... ] A notable exception to the rule may exist when the product is rendered valueless as a result of the defect-then the purchase price is the appropriate measure of actual damages." Rollins, Inc. v. Butland, 951 So.2d 860, 869-70 (Fla. App. 2 Dist. 2006) (quoting Rollins, Inc. v. Heller, 454 So.2d 580, 585 (Fla. 3d DCA 1984)). For purposes of recovery under FDUTPA, "actual

- 24 -

damages" do not include consequential damages. See id. (citing Fort Lauderdale Lincoln Mercury, Inc. v. Corgnati, 715 So.2d 311, 314 (Fla. 4th DCA 1998)).

Here, twelve of the 119 AMT U.S. customers whose Bitcoin Miner orders remain unfulfilled reside in Florida and may potentially assert a claim for actual damages under the FDUTPA. The sum of the contractual amounts paid by these customers is $98,264.00. However, this amount already was accounted for in Defendants' analysis of potential class claims for compensatory damages, generally. See supra Part III.B.1 (discussing the maximum amount of compensatory damages exposure as represented by the total amount potential class members paid for the purchase of a Bitcoin Miner). Thus, because the FDUTPA precludes any additional forms of damages, such as consequential damages, Plaintiffs have no additional substantive damages under Florida law that are unique from the damages already included in aggregating the total amount in controversy under CAFA.

While section 501.2105(1) of the FDUTPA permits the award of attorneys fees as a discretionary award to the prevailing party, such recovery by Plaintiffs here is precluded as a matter of law because the effort expended on a FDUTPA claim and any recovery is subsumed by Plaintiffs' efforts at litigating the other common law causes of action the Plaintiffs allege for the class as a whole. See VP Gables, LLC v. Cobalt Group, Inc., 597 F.Supp.2d 1326, 1330 (S.D.Fla. 2009) ("An award of fees under FDUTPA is discretionary. . . .[and] [w]hen there was no additional effort in defending the case because of a FDUTPA claim, fees should not be awarded in accordance with FDUTPA. (internal citations omitted)); see also PNR, Inc. v. Beacon Property Management, Inc., 842 So.2d 773, 777 (Fla. 2003) ("To the extent an action giving rise to a breach of contract or breach of lease may also constitute an unfair or deceptive act, such a claim is and has always been cognizable under the FDUTPA."). Further, even if attorney's fees were permitted in Plaintiffs' situation, any statutory right to attorneys' fees under the FDUTPA, could only include that pro rata share of the attorney's fees paid by or attributable to the respective

Florida class members. See, e.g., Cohen v. Office Depot, Inc., 204 F.3d 1069, 1082-83 (11th Cir. 2000) (" . . . the amount of claimed attorney fees may not be considered in the aggregate—may not be attributed in whole to each class member—but instead, like the class claim for punitive damages, it must be divided out among the total number of class members for amount in controversy purposes.")

In light of the above Florida precedent, Plaintiffs' have no additional damages arising from their FDUTPA causes of action that are not already subsumed within their potential recovery under the other common law causes of action. Accordingly, Plaintiffs' may not rely on any alleged amount in controversy arising from the FDUTPA claim towards proving the $5,000,000 threshold under CAFA.

Last, Plaintiffs' private cause of action under Count XIII for alleged "unfair competition" under the California Business and Professionals Code is limited to equitable relief and provides no additional sum towards calculating the amount in controversy under CAFA. Brown v. Allstate Ins. Co., 17 F. Supp. 2d 1134, 1140 (S.D.Cal. 1998) ("Private individuals cannot seek damages for unfair business practices under this statute. Private remedies are limited to equitable relief, and civil penalties are recoverable only by specified public officers.") (citing Cal. Bus. & Prof'l Code §§ 17200, 17203–17206; Dean Witter Reynolds, Inc. v. Superior Court, 211 Cal. App. 3d 758, 774, 259 Cal. Rptr. 789 (1989) (compensatory damages are not recoverable under § 17200)).

Accordingly, the Plaintiffs have no additional amounts in controversy arising independently from their state consumer law claims and cannot count such damages towards satisfying CAFA's $5,000,000 amount in controversy threshold.

## IV.   CONCLUSION

For the foregoing reasons, Defendants in the above-captioned lawsuit respectfully request that the Plaintiffs' First Amended Complaint be dismissed.

13979550v.1

WHITE AND WILLIAMS LLP


BY:     __s/Primitivo J. Cruz_____
        Michael N. Onufrak
        Primitivo J. Cruz
        1650 Market Street | One Liberty Place,
        Suite 1800 |
        Philadelphia, PA  19103-7395
        Phone: 215.864.7174/6865
        Attorneys for Defendants


Dated: July 17, 2014

# EXHIBIT "A"

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| CRAIG LENNELL, et al. | : CIVIL ACTION |
| Plaintiffs, | : |
| | : NO: 2:14-CV-01924-LDD |
| v. | : |
| | : |
| ADVANCED MINING TECHNOLOGY, INC., | : |
| et al., | : |
| Defendant. | : |
| | : |
| | : |

## DECLARATION OF JOSHUA ZIPKIN

1.      I am the founder, sole shareholder, President and CEO of Advanced Mining Technologies, Inc. ("AMT") and I am authorized to make this declaration on AMT's behalf.

2.      AMT is a corporation organized under the laws of the State of Delaware, with its principal place of business located in Jenkintown, Pennsylvania.

3.      Since September 2013, AMT has been engaged in the business of distributing specialized computer hardware developed by computer chip manufacturers for use in mining bitcoin.

4.      Bitcoin is a decentralized peer-to-peer payment network powered by users on the network, or "miners," who collectively process bitcoin transactions without a central authority or middleman. Bitcoin transactions are broadcast through the network and each "miner" attempts to perform the appropriate tasks to process and confirm Bitcoin transactions. "Mining" is the process by which miners use computing power to process transactions, secure the network and keep all the miners in the system synchronized. Bitcoin miners perform this work in order to earn transaction fees and newly created bitcoins if they are the first miner to process, confirm and broadcast transactions to the network.

5.      Since AMT's inception last fall, AMT worked with several chip manufacturers to develop AMT-branded Miners. Unlike a typical PC, AMT's Miners use application specific integrated circuit (ASIC) computer chips specially made for bitcoin mining. Each ASIC chip is designed to efficiently perform transactions from the Bitcoin network in a process commonly referred to as "hashing." AMT sold a variety of bitcoin mining units, including the AMT 80 GH/s Bitcoin Miner, AMT 128 GH/s Bitcoin Miner, AMT 180 GH/s Bitcoin Miner, AMT 220 GH/s Bitcoin Miner, and AMT 320 GH/s Bitcoin Miner. These models used ASIC chips which AMT procured through a chip manufacturer, Bitfury.

6.      In October 2013, AMT partnered with a new chip manufacturer, Bitmine AG ("Bitmine"), a Swiss company dedicated to developing high performance Bitcoin hardware. AMT served as the exclusive U.S. wholesale distributor of Bitmine's Coincraft A1 ("Coincraft A1") chip and also sold and assembled Miners with the new chip. At the time, the Coincraft A1 was new technology developed by Bitmine, based on 28nm ASIC chip architecture that had yet to be successfully brought to market by other manufacturers in the bitcoin hardware space.

7.      In addition to distributing Bitmine's Coincraft A1 chips to other distributors at wholesale, AMT purchased preassembled boards or "modules" with Coincraft A1 chips already installed, along with corresponding "rig" units, which AMT could easily assemble for resale in the United States. These Coincraft A1 modules and rigs were designed to be scalable, allowing manufacturers to offer Miners of different processing power according to a miner's needs or price constraints, and to allow for easy upgrading. As such, AMT relied on Bitmine to engineer, design and deliver the underlying components, whereupon AMT could then assemble the Miner rigs themselves according to AMT's chosen specifications.

-2-

8.     In October 2013, AMT began taking pre-orders for new Coincraft A1 – equipped Miners such as the AMT 520 GH/s Bitcoin Miner ("AMT 520 Miner") and the AMT 1.2 TH/s Bitcoin Miner ("AMT 1.2 TH/s Miner"). Pursuant to AMT's agreement with Bitmine, the initial shipment of Coincraft A1 modules and rig units was expected by mid-December 2013, with the ability to purchase additional modules and components from Bitmine as needed.

9.     AMT reasonably estimated that its initial run of these new Miners would begin shipping to customers as early as January, 2014. Accordingly, AMT provided customers with delivery estimates of approximately 6-8 weeks from order acceptance. Pursuant to AMT's Terms of Sale, customer orders were accepted by AMT upon receipt of payment.  However, the Terms of Sale, attached hereto as Exhibit "One," reiterated that "shipping and delivery times are estimates" and acknowledged that delivery schedules may be subject to delays beyond AMT's control.

10.    To date, AMT received 183 accepted orders from 158 U.S. customers with a total of 219 Miners being ordered according to AMT's summary of U.S. sales attached hereto as Exhibit "Two".  Each miner entered into a contract with AMT by accepting AMT's Terms of Sale, which were presented to each miner at the time of order and no order would be processed without a customer's acceptance of these terms.  See Exhibit "One".  AMT filled 45 U.S. orders to date, issued three refunds, settled one small claim case and continues to satisfy more orders each day.  However, due to unforeseen circumstances beyond AMT's control as more fully described below, AMT still has 135 outstanding orders from 119 U.S. customers. The sum of the amounts paid by these 119 U.S. customers totals $973,959.12.

11.    In December, 2013, AMT learned that Bitmine would not be able to deliver the pre-assembled Coincraft A1 Miners by the delivery date and would only be able to partially

fulfill AMT's order for standalone Coincraft A1 chips.  For weeks in December, 2013 and January, 2014, I communicated with Bitmine to seek confirmation of when delivery would occur. When it appeared that delivery of the Coincraft A1 modules would be delayed further, AMT came to an arrangement with Bitmine whereby Bitmine would provide standalone Coincraft A1 chips to AMT with the technical specifications needed to produce the Coincraft modules and rigs, so AMT could deliver the AMT 520 and 1.2 TH/s Miners that were sold to customers.

12.     Accordingly, AMT found an electrical engineering firm to assist AMT in assembling the Coincraft A1 modules and other components needed to complete its AMT 520 and 1.2 TH/s Miners.  AMT engaged IMET Corporation ("IMET"), an electrical engineering and design firm in Southampton, Pennsylvania to build the Coincraft A1 modules and necessary components for the rigs. During my initial meeting with Tom Krol, IMET's CEO, in January, 2014, IMET was informed of AMT's time constraints from the unexpected delays in initial delivery in December.  IMET assured AMT that it had the technical expertise, facilities and workforce to design and assemble enough working Coincraft modules to accommodate a first run of  AMT 520 and AMT 1.2 TH/s Miners to fill AMT's pre-orders.

13.     AMT began working closely with IMET to design and assemble the Coincraft A1 modules, and I provided IMET with the technical specifications for these components received from Bitmine. I, and other AMT staff,  regularly worked at IMET's Southampton facility to keep the process moving and to address any issues that arose.  To the extent IMET had technical questions pertaining to the Coincraft A1 module design, I ensured that such inquiries were forwarded to Bitmine and expeditiously addressed.  Further, on certain occasions I went so far as

to get IMET personnel directly in touch with Bitmine's developers in Switzerland so any technical questions that arose could be resolved.

14.     However, IMET's efforts were fraught with delays and irregularities. IMET took weeks longer than originally promised to design a prototype module for testing, notwithstanding the fact that AMT provided IMET with Bitmine's own design specs and ensured that IMET could address any technical inquiries directly with Bitmine's development team. Further, even after IMET finally produced a prototype and initial run for testing, numerous problems arose wherein some of the IMET-designed Coincraft A1 modules failed IMET's initial testing, or stopped working altogether upon AMT's own tests of the Miners during the assembly phase. After working with IMET for approximately 8 weeks, AMT found that approximately fifty percent of the IMET-designed Coincraft A1 modules produced to date did not work.

15.     Notwithstanding these issues, AMT continues to try to fulfill outstanding orders as best it can. Further, AMT has to date fulfilled all of its European orders. Since April 2014, AMT has been in discussions with others besides IMET, to fulfill its remaining outstanding orders as quickly as possible and on a larger scale than up to now.

16.     In late June 2014, I traveled to China to finalize an agreement with a new manufacturer to produce the Miners for the outstanding U.S. orders.  Presently, AMT has arranged for shipping a batch of Miners from new manufacturing facilities in China.  As of today, AMT expects some of these Miners will be ready to ship this Friday, July 18, 2014, and a several already were shipped.  AMT expects more Miners will be shipped from this batch early next week.  Further, AMT is continuing to work with its new manufacturing partners to produce additional Miners to satisfy any remaining U.S. orders.  AMT will supply the Court with an updated summary of these, and future, customer fulfillments in a supplemental filing.

14008163v.1

17.     AMT has been inundated with customer complaints, letters from attorneys, bad-mouthing and criticism on Bitcoin related social media sites and other lawsuits besides this one. I have done my best to respond to each complaint and to find a solution for the customer and will continue to do so.

14008163v.1

I understand that false statements made herein are subject to the penalties of 28 U.S.C. § 1746 relating to unsworn falsification to authorities.

ADVANCED MINING TECHNOLOGY, INC.

BY: _____
Joshua Zipkin, President and CEO

Dated:    7/17/2014

EXHIBIT "1"

Advanced Mining TechnologiesBitcoin Mining Hardware (https://advancedminers.com/bitcoin-mining-hardware/)June 16th, 2014

Language

(http://facebook.com/bitcoinmininghardware)
Store (bitcoin-mining-hardware/)
Login/My Account (/my-account)



(https://advancedminers.com/)

- CoinMiners (https://advancedminers.com/bitcoin-mining-hardware/)

- Asic Chips (https://advancedminers.com/product-category/asic-chips/)

- News (https://advancedminers.com/bitcoin-mining-news/)    Support (https://advancedminers.com/client-support/)

- Contact (https://advancedminers.com/contact/)

To search type and hit er

1-855-866-MINE (6463)
Sales@AdvancedMiners.com

# Terms And Conditions

The following is a terms of sale consumer agreement  Applies to all direct purchases by internet, phone or on location.

By taking the action of selecting the "I have read and accept the terms and conditions" box you physically agree that you have read in full the following Terms of Sale ("Agreement") and will comply with this agreement in full, on all counts. These Consumer Terms of Sale apply to direct purchases made from AMT by phone, the internet or electronic mail. These Terms are also applicable to Businesses or any other legal entity.

These Terms of Sale ("Agreement") apply to your purchase of products and/or services ("Product") sold by AMT, including its affiliates or subsidiaries to consumers and/or businesses for their own use. By placing your order and/or purchasing your order for Product, you accept and are bound to the terms of this Agreement. Please do not order if you do not agree to be bound by this Agreement.

• Other Documents. This Agreement may NOT be altered, supplemented or amended by the use of any other document(s) unless otherwise agreed to in a written agreement signed by both you and AMT. If you do not receive an invoice or acknowledgement in the mail, via email, or with your Product, information about your purchase may be obtained by contacting sales.

• Payment Terms; Orders; Quotes; Interest. Terms of payment are within AMT's sole discretion and unless otherwise agreed to by AMT, full payment (either direct from you to AMT or via a third party) must be received by AMT prior to AMT's acceptance of an order. Payment for the products will be made by credit card, Paypal, or some other prearranged payment method unless credit terms have been agreed to by AMT. AMT is not responsible for pricing, typographical or other errors in any offer by AMT and reserves the right to cancel any orders arising from such errors.

• Shipping Charges; Taxes; Title; Risk of Loss. Shipping, handling and tax are additional unless otherwise expressly indicated at the time of sale. Products are delivered to you Ex Works in accordance with INCOTERMS 2010. This means title to products passes from AMT to you upon shipment. Loss or damage that occurs during shipping by a carrier is your responsibility. You must notify AMT within 21 days of the date of shipment if you believe any part of your purchase is missing, wrong or damaged. Unless you provide AMT with a valid and correct tax exemption certificate applicable to your purchase of Product and the Product ship to location, you are responsible for sales and other taxes associated with the order. Shipping and delivery dates are estimates only.

• Warranties. AMT MAKES NO OTHER WARRANTIES FOR AMT-BRANDED PRODUCT, AND MAKES NO WARRANTIES WHATSOEVER FOR SERVICE, SOFTWARE, MAINTENANCE OR SUPPORT OR FOR NON-AMT BRANDED PRODUCT. AMT MAKES NO EXPRESS WARRANTIES EXCEPT THOSE STATED IN AMT'S APPLICABLE AMT-BRANDED WARRANTY IN EFFECT ON THE DATE OF THE INVOICE, PACKING SLIP OR OTHER ACKNOWLEDGEMENT. AMT-BRANDED WARRANTIES AND SERVICES ARE EFFECTIVE ON PAYMENT IN FULL, AND AMT IS NOT OBLIGATED TO HONOR ANY WARRANTY OR PROVIDE SERVICE UNTIL AMT RECEIVES PAYMENT IN FULL. AMT warrants that its Product(s) will, at the time of shipment and for a period of ninety days thereafter, be free from defects in components and workmanship. AMT's warranty is only valid if the Product(s) has not been tampered with by the consumer. If the Product(s) casing, components, processing chip, PCB board, Heat sink, power supply, and any/all other physically elements of the product has been opened, altered, tampered with in any manner, the AMT warranty governing the Product(s) will be effectively null and void. Precautions have been put in place by AMT in AMT Product(s) to ensure verification of said happenings. Buyer must advise AMT in writing of any claims within the warranty period, obtain AMT's return authorization, and return the Product(s) to a facility or location directed by AMT. If the Product(s) are not as warranted, AMT shall, at AMT's option, either refund the purchase price of the Product. In no event, however, shall AMT be responsible for any non-conformance or other defects in the Product(s) resulting from improper handling during or after shipment, misuse, neglect, improper installation or operation, repair, alteration, accident or for any other cause not attributable to defective workmanship or failure to meet specifications on the part of AMT. This warranty shall not be expanded, and no obligation or liability will arise, due to technical advice or assistance, computerized data, facilities or services AMT may provide in connection with Buyer's purchase. AMT provides no

warranty for AMT Product(s) purchased through unauthorized sales channels. AMT warrants replacement Product(s) for the remaining term of the warranty on the originally delivered Product.

• Software. In the absence of a separate software agreement between Buyer and AMT, the following terms and conditions apply to AMT's licensed or Open Source programs:

• Licensed programs include computer software and firmware in all forms. Title to the licensed programs delivered by AMT to Buyer hereunder remains vested in AMT or AMT's licensor and cannot be assigned or transferred without AMT's written authorization. Buyer agrees to respect and not to remove any copyright, trademark, confidentiality or other proprietary notice, mark or legend appearing on the software, and not to reverse engineer, disassemble, decompile, or modify any licensed programs.

• For standalone licensed programs provided in connection with the purchase of Product(s) from AMT, AMT grants to Buyer an individual, personal, non-transferable, non-exclusive license, without the right to sublicense, to use the standalone licensed programs for its own internal use in a single computer system to evaluate, demonstrate, test and/or configure Product(s) for AMT authorized applications or to design Product(s) for manufacture by AMT only. Buyer shall faithfully reproduce all of AMT's copyright notices and other proprietary legends. Buyer agrees not to disclose, in any form, the standalone licensed programs or any portion thereof to any person other than employees of Buyer without the express written permission of AMT.

• For licensed or Open Source programs embedded in Product(s), AMT grants Buyer a non-transferable, non-exclusive license to use such embedded licensed programs in the AMT authorized operation of Product(s) on which such programs are embedded and subject to the terms and conditions herein. Buyer may transfer its license to use the embedded licensed programs to a third party only in conjunction with Buyer's sale of any AMT Product (s) or Buyer product on which the AMT Product(s) with embedded licensed program is installed. Buyer's transfer of the embedded licensed program as authorized herein must be under terms consistent with and no less stringent than the terms set forth in this document. Except as specifically permitted in this document, embedded licensed programs may not be sublicensed, transferred or loaned to any other party without AMT's prior express written consent.

• EXCEPT AS EXPRESSLY PROVIDED HEREIN, THE SOFTWARE IS PROVIDED "AS IS." AMT EXPRESSLY DISCLAIMS ALL WARRANTIES WITH RESPECT TO THE SOFTWARE, WHETHER EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION, WARRANTIES OF NONINFRINGMENT, MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE, AND ANY WARRANTY OF CONTINUED OR UNINTERRUPTED OPERATION OF THE SOFTWARE LICENSED HEREUNDER.

• Changed or Discontinued Product. AMT's policy is one of ongoing update and revision. AMT may revise and discontinue Product at any time without notice to you and this may affect information saved in your online "cart." AMT will ship Product that has the functionality and performance of the Product ordered, but changes between what is shipped and what is described in a specification sheet or catalog are possible.

• Export Conditions. If, at the time or times of AMT's performance hereunder, an export license is required for AMT to lawfully export Product(s) or technical data, then the issuance of the appropriate license to AMT or its subcontractor shall constitute a condition precedent to AMT's obligations hereunder. You agree to comply with all applicable export laws, regulations and orders, including, but not limited to, all such laws, regulations and orders of the United States of America. Specifically, but without limitation, you agree that you will not resell, re-export or ship, directly or indirectly, any Product(s) or technical data in any form without obtaining appropriate export or re-export licenses. You acknowledge that the applicable export laws, regulations and orders may differ from item to item and/or time to time.

• Resale Prohibited. Unless expressly authorized in writing by AMT, you shall not resell Product(s). If you breach the terms of this paragraph, in addition to AMT's cancellation rights, you agree to fully indemnify AMT, its officers, employees and distributors from any and all resulting liability, including attorneys' fees and costs.

• Excusable Delay. AMT shall not be liable for any delay or failure to perform due to any cause beyond its control or the control of its suppliers or subcontractors such as, for example, strikes, acts of God, acts of Buyer, Acts of Financial Payment Processing institutions, including freezing/holding of accounts, consumer payments, and interruption of transportation or inability to obtain the necessary labor, materials or facilities. Delivery schedules shall be considered extended by a period of time which AMT deems necessary due to the event circumstances or cause of delay. In the event AMT is unable wholly or partially to perform because of any such cause it may cancel its acceptance of Buyer's order without liability to Buyer.

• Limitation of Liability. IN NO EVENT SHALL AMT'S AGGREGATE LIABILITY FOR ANY BREACH, WARRANTY, INDEMNITY OR OTHER OBLIGATION OR LIABILITY ARISING OUT OF OR IN CONNECTION WITH THE SALE OF PRODUCT(S) OR SERVICES HEREUNDER OR THE USE OF ANY AMT PRODUCT PROVIDED HEREUNDER, EXCEED THE PURCHASE PRICE OF THE PARTICULAR PRODUCT(S) OR SERVICES WITH RESPECT TO WHICH LOSSES OR DAMAGES ARE CLAIMED.??IN NO EVENT SHALL AMT BE LIABLE FOR SPECIAL, INCIDENTAL OR CONSEQUENTIAL?DAMAGES OF ANY NATURE WHATSOEVER (INCLUDING, BUT NOT LIMITED TO, LOSS OF PROFITS, LOSS OF USE AND LOSS OF GOODWILL), REGARDLESS OF WHETHER AMT HAS BEEN GIVEN NOTICE OF ANY SUCH ALLEGED DAMAGES, AND REGARDLESS OF WHETHER SUCH ALLEGED DAMAGES ARE SOUGHT UNDER CONTRACT, TORT OR OTHER THEORIES OF LAW.

Transfers. AMT is required to notify all consumers in the event AMT transfers its rights, liabilities, and obligations to another organization, or and/or legal entity after the time which said transfer has taken place. You agree AMT does not require your permission to conduct transfers of AMT rights, liabilities and obligations, or sale of any other legal entity governing AMT and it's business practices. You understand that any transfers will not affect your rights under these Terms, but will be transferred to the organization, or and/or legal entity and it will be it's responsibility to fulfill these terms.

• Governing Law. The terms of this document shall be interpreted, construed and governed in all respects in accordance with the laws of the state of Pennsylvania, U.S.A., excluding its conflict of laws provisions. The UN Convention on Contracts for the International Sale of Goods (Vienna, 1980) shall not apply to any purchases made hereunder.

• Consumer Refund. AMT will only provide financial refunds if AMT is at fault for noncompliance with these terms and conditions, and any/all future terms and conditions AMT publishes and/or makes notice of.

• Dispute Resolution. AMT and Buyer will attempt to settle all claims (other than claims relating to intellectual property issues) through negotiation and non-binding mediation prior to commencement of court proceedings.

• Other Miscellaneous Terms.

Waiver. Failure by AMT to exercise or enforce any rights hereunder shall not be deemed to be a waiver of any such right nor operate so as to bar the exercise or enforcement thereof at any time or times thereafter.

Notices. Any notice hereunder shall be deemed to have been duly given if sent by pre-paid first class post to the party concerned at its last known

address.

Amendments. No modifications to this document shall be binding unless expressly agreed to in writing by AMT.

Severability. If any provision of this document is held invalid, all other provisions shall remain valid.

No Assignment. Neither party may assign its rights and obligations hereunder without the prior written consent of the other, though AMT is permitted to subcontract all or part of its obligations hereunder as it deems necessary. Any unauthorized assignment shall be null and void.

Disclaimer for Critical Applications. Product(s) sold under these terms and conditions are not designed, intended or authorized for use as a critical component in life support or safety devices or systems, or any FDA Class 3 medical devices or medical devices with a similar or equivalent classification in a foreign jurisdiction, or any devices intended for implantation in the human body. Sale for such use is subject to AMT's advance written authorization for product use and a separate indemnification agreement signed by Buyer. Buyer agrees to indemnify, defend and hold harmless AMT, its directors, officers, employees, representatives, agents, subsidiaries, affiliates, distributors, and assigns, against any and all liabilities, losses, costs, damages, judgments, and expenses, arising out of any claim, demand, investigation, lawsuit, regulatory action or cause of action arising out of or associated with any unauthorized use, even if such claim alleges that AMT was negligent regarding the design or manufacture of the Product(s).

Entire Agreement. This document constitutes the entire This Agreement is the supersedes all other communications.

## About AMT



Advanced Mining Technology Inc (AMT) develops SHA-256 coin mining technology for personal and business level mining devices.  As a technology manufacturer... Read More (/bitcoin-miner-manufacturer/)

## Payment Methods

### CC payments are only for our smaller miners

PayPal   VISA   AMERICAN EXPRESS

฿   MasterCard

Øbitcoin

## Subscribe Here!

Get Updates On AMT Sales, News, Promos

Your Name

Your Email

I want updates!

## Contact Us

Phone: 1855-866-6463
Fax: 1855-866-6462

E-Mail:
sales@AdvancedMiners.com
(mailto:sales@AdvancedMiners.com)
Web: www.AdvancedMiners.com
(http://www.AdvancedMiners.com)

355 Lancaster, Bldg. E1, Haverford
PA 19041

Copyright © 2013 Advanced Mining Technology
(http://advancedminers.com ) Inc All rights reserved.

(http://facebook.com/bitcoinmining
hardware)

# EXHIBIT "2"

ALL-USA-ONLY-DATA

| order number | Customer | order date | payment date / date format (dd.mm.yyyy) | Shipping Method Used | Shipping date | other comment | order_total | shipping postcode | shipping_city | shipping state | shipping country | order_item | Unique Customer Count |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1437 | C.S. | 1/31/2014 | 2/7/2014 | FedEx | 7/4/2014 | | $ 5,759 | 85004 | Phoenix | AZ | United States | 1 1.27TH/s Coin Miner (AMT12200) x1 | 1 |
| 891 | A.A. | 12/5/2013 | 12/14/2013 | FedEx | January | | $ 2,364 | 90745 | Carson | CA | United States | 1 AMT60\|1\|13299 | 3 |
| 928 | S.C. | 12/6/2013 | 12/9/2013 | FedEx | 27/01/2014 | | $ 1,680 | 92627 | Costa Mesa | CA | United States | 1 AMT60\|1\|13545 | 3 |
| 734 | M.H. | 11/24/2013 | 12/7/2013 | UPS | 18/01/2014 | part of deposit for 3G130/ Refunded star | $ 1,605 | 94568 | Dublin | CA | United States | 1 AMT60\|1\|13445 | 3 |
| 1328 | K.K. | 1/13/2014 | 1/6/2014 | FedEx | 10/2/2014 | | $ 1,635 | 95819 | SACRAMENTO | CA | United States | 1 1.80 GH/s Coin Miner (AMT60) x1 | 1 |
| 932 | S.I. | 12/6/2013 | 12/31/2013 | FedEx | 7/4/2014 | | $ 6,159 | 95206 | Stockton | CA | United States | 1 AMT200\|1\|15999 | 1 |
| 931 | S.I. | 1/22/2014 | 1/2/2014 | FedEx | 18/02/2014 | | $ 1,705 | 95831 | Sacramento | CA | United States | 1 1.80 GH/s Coin Miner (AMT60) x1 | 1 |
| 860 | A.A. | 12/23/2013 | 12/14/2013 | UPS | 5/2/2014 | Refunded a 138GH | $ 1,635 | 95131 | San Jose | CA | United States | 1 AMT200\|1\|13545 | 0 |
| 867 | C.S. | 12/4/2013 | 12/4/2013 | FedEx | 7/4/2014 | Received a 138GH | $ 6,159 | 90036 | Los Angeles | CA | United States | 1 1.27TH/s Coin Miner (AMT12200) x1, AMT 180 | 1 |
| 386 | D.K. | 1/22/2014 | 12/10/2013 | FedEx | 7/5/2014 | 2 May miner | $ 8,958 | 06812 | New Fairfield | CT | United States | 1 GHz Bitcoin Miner (AMT192) x1 | 1 |
| 966 | J.D. | 12/10/2013 | 12/10/2013 | FedEx | 12/12/2014 | | $ 5,995 | 32225 | Jacksonville | FL | United States | 1 AMT200\|1\|15999 | 1 |
| 951 | S.I. | 10/31/2013 | 10/31/2013 | UPS | 12/12/2014 | | $ 2,459 | 33755 | Clearwater | FL | United States | 1 AMT192\|1\|12349 | 1 |
| 886 | J.F. | 12/6/2013 | 12/6/2013 | Local pick up | 5/2/2014 | | $ 2,459 | 34233 | Sarasota | FL | United States | 1 AMT60\|1\|13545 | 1 |
| 857 | R.G. | 12/4/2013 | 12/4/2013 | FedEx | 24/01/2014 | | $ 2,459 | 32810 | Orlando | FL | United States | 1 AMT128\|1\|12299 | 1 |
| 1142 | C.I. | 12/23/2013 | 12/26/2013 | FedEx | 5/2/2014 | | $ 2,499 | 32250 | Jacksonville Beach | FL | United States | 1 AMT 128 GHz Bitcoin Miner (AMT128) x1 | 0 |
| 1052 | D.M. | 12/12/2013 | 12/12/2013 | FedEx | 7/4/2014 | | $ 6,149 | 33015 | Miami beach | FL | United States | 1 AMT200\|1\|15999 | 1 |
| 750-2 | A.P. | 1/27/2014 | 1/27/2014 | FedEx | 30/01/2014 | 30/01/2014 upgraded to AMT 320 | $ 1,800 | 34983 | Port St. Lucie | FL | United States | 1 AMT60\|1\|13445 | |
| 942 | A.R. | 12/7/2013 | 12/7/2013 | FedEx | 5/2/2014 | | $ 3,934 | 33157 | Miami | FL | United States | 1 AMT128\|1\|12299 | 1 |
| 880 | A.V. | 12/6/2013 | 11/18/2013 | FedEx | 10/4/2014 | | $ 4,364 | 33186 | Miami | FL | United States | 1 AMT60\|1\|14299 | 2 |
| 805 | V.P. | 12/13/2013 | 11/18/2013 | UPS | 21/01/2014 | | $ 9,133 | 33196 | Miami | FL | United States | 1 AMT520\|1\|14299 | 0 |
| 854 | D.G. | 12/4/2013 | 12/4/2013 | FedEx | 29/01/2014 | | $ 2,459 | 30215 | Sharpsburg | GA | United States | 1 AMT520\|1\|18998 | 1 |
| 961 | C.P. | 12/4/2013 | 12/10/2013 | UPS | 8/4/2014 | | $ 6,089 | 61604-5721 | Peoria | IL | United States | 1 AMT128\|1\|12299 | 3 |
| 720 | J.M. | 11/23/2013 | 11/23/2013 | UPS | 12/01/2014 | | $ 2,389 | 20376 | Germantown | MD | United States | 1 AMT200\|1\|15999 | 1 |
| 1144 | E.L. | 12/23/2013 | 1/8/2014 | FedEx | 11/7/2014 | Pregarca Del Rey | $ 11,998 | 48625 | HARRISON | MI | United States | 1 AMT200\|1\|15999 | 1 |
| 938 | B.Z. | 12/9/2013 | 12/12/2013 | FedEx | 8/4/2014 | | $ 6,089 | 7201 | Elizabeth | NJ | United States | 2 1.27H/s Coin Miner (AMT12200) x2 | 2 |
| 686 | M.B. | 11/16/2013 | 11/18/2013 | Local Pick up | 18/03/2014 | Paid by Irene Ultee on behalf of Jonathan Mclarnohm sold to | $ 5,889 | 7936 | East Hanover | NJ | United States | 1 AMT200\|1\|15999 | 1 |
| 692 | M.B. | 11/18/2013 | 11/18/2013 | Local pick up | 26/03/2014 | Picked up 3 | $ 17,322 | 11797 | Woodbury | NY | United States | 3 AMT12200\|3\|17997 | 1 |
| 579 | R.D. | 11/6/2013 | 11/7/2013 | UPS | January | | $ 2,534 | 11797 | Woodbury | NY | United States | 1 AMT12200\|1\|17997 | 1 |
| 1123 | C.M. | 12/20/2013 | 12/31/2013 | Local pick up | 27/03/2014 | | $ 6,000 | 14534 | Pittsford | NY | United States | 1 1.27TH/s Coin Miner (AMT12200) x1 | 1 |
| 1124 | C.M. | 12/21/2013 | 12/31/2013 | Local pick up | 27/03/2014 | | $ 6,000 | 13440 | Rome | NY | United States | 1 1.27TH/s Coin Miner (AMT12200) x1 | 0 |
| 493 | A.S. | 2/14/2014 | 2/18/3014 | Local pick up | 18/04/2014 | redeived 1\|178 | $ 11,198 | 13440 | Rome | NY | United States | 2 1.27TH/s Coin Miner (AMT12200) x2 | 1 |
| 1492 | F.T. | 7/14/2014 | 2/22/2014 | Local pick up/FedEx | 5/4/2014 | Picked up 1 machine, received by FedEx | $ 33,594 | 11581 | Valley Stream | NY | United States | 6 1.27H/s Coin Miner (AMT12200) x6 / Coin Craft A1 Chip (CCA128mH) x1 - Quantity: 25 | 0 |
| 1695 | G.V. | 4/2/2014 | 4/3/2014 | FedEx | 5/4/2014 | | $ 2,240 | 14004 | Allen | NY | United States | 5 1.27TH/s Coin Miner (AMT12200) x5 | 1 |
| 1327 | A.W. | 1/13/2014 | 1/16/2014 | Local Pick up | 7/4/2014 | part of deposit for 3G130/ Picked up 1 Machine | $ 28,495 | 14546 | Scottsville | NY | United States | 5 1.27TH/s Coin Miner (AMT12200) x5 | 0 |
| 553 | L.S. | 10/03/2013 | 12/13/2013 | Local Pick up | 7/4/2014 | | $ 5,659 | 11219 | Brooklyn | OH | United States | 1 AMT200\|1\|15209 | 1 |
| 1272 | S.A. | 1/7/2014 | 1/7/2014 | FedEx | 18/02/2014 | | $ 1,705 | 44129 | Parma | TX | United States | 1 1.80 GH/s Coin Miner (AMT60) x1 | 3 |
| 1217 | K.Y. | 12/29/2013 | 12/29/2013 | Local pick up | 31/01/2014 | | $ 1,635 | 79015 | Canyon | TX | United States | 1 1.80 GH/s Coin Miner (AMT60) x1 | 3 |
| 861 | M.B. | 1/28/2013 | 12/7/2013 | FedEx | 17/01/2014 | | $ 4,583 | 79382 | Wolfforth | VA | United States | 3 AMT60\|3\|14385 | 1 |
| 1399 | P.D. | 1/26/2014 | 1/30/2014 | Local Pick up | 10/4/2014 | | $ 5,799 | 22554-2120 | Stafford | VA | United States | 1 1.27TH/s Coin Miner (AMT12200) x6 | 0 |
| 720 | V.M. | 11/19/2013 | 12/7/2013 | Local pick up | 5/13/2014 | | $ 5,799 | 22003 | Annandale | VA | United States | 1 AMT12200\|1\|15799 | 1 |
| 685 | M.L. | 11/24/2013 | 12/2/2013 | FedEx | 20/01/2014 | | $ 1,535 | 24141 | Radford | WA | United States | 1 AMT60\|1\|11445 | 1 |

ALL-USA-ONLY-DATA

| order number | Customer | order date | payment date / date format dd.mm.YYYY | Shipping Method Used | Shipping date | other comment | order total | shipping postcode | shipping city | shipping state | shipping country | Number of miners | order item | Unique Customer Count |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1360 | M.L. | 1/21/2014 | 1/27/2014 | FedEx | | | $ 6,085 | 98004 | Bellevue | WA | | 1 | 1:1.2TH/s Coin Miner (AMT1200) x1 | 0 |
| 1533 | K.F. | 2/11/2014 | 2/18/2014 | Local Pick-up | 7/5/2014 | 29/04/2014 Picked up 2 machines | $ 5,759 | 53148 | Salem | WI | United States | 1 | 1:1.2TH/s Coin Miner (AMT1200) x1 | 0 |
| 255 | D.H. | 1/4/2014 | 1/4/2014+1 | FedEx | 10/2/2014 | | 1,635 | 26074 | West Liberty | WV | United States | 1 | 1:180 GH/s Coin Miner (AMT66) x1 | |
| 1325 | J.W.D. | 1/13/2014 | 1/3/2014 | | | refunded JWD Investments LLC | $ 6,085 | 36509 | Saraland Mobile | AL | United States | 1 | 1:1.2TH/s Coin Miner (AMT1200) x1 | 1 |
| 731 | A.B. | 11/24/2013 | 11/24/2013 | | | originally provided military address not suitable for delivery | 2,385 | 60635 | La Grange | IL | United States | 1 | 1:AMT12B1|12299 | 0 |
| 845 | Y.P. | 12/4/2013 | 12/03/2013 | | | | 6,159 | 85360 | Wickenburg | AZ | United States | 1 | 1:AMT1200|11S999 | |
| 1058 | J.S. | 12/19/2013 | 12/01/2013 | | | | 6,000 | 85255 | Scottsdale | AZ | United States | 1 | 1:AMT1200|11S999 | |
| 1431 | O.A. | 1/31/2014 | 2/3/2014 | | | OAF Holdings | 5,689 | 91331 | Pacoima | CA | United States | 1 | 1:1.2TH/s Coin Miner (AMT1200) x1 | |
| 1397 | R.B. | 12/26/2013 | 12/31/2013 | | | R&B Consultants, LLP | 6,159 | 94947 | Novato | CA | United States | 1 | 1:1.2TH/s Coin Miner (AMT1200) x1 | 1 |
| X79 | J.B. | 12/24/2013 | 12/24/2013 | | | | 12,158 | 94117 | San Francisco | CA | United States | 2 | 2:AMT12B1|211998 | |
| 1290 | A.C. | 1/10/2014 | 1/10/2014 | | | | 6,159 | 91711 | Claremont | CA | United States | 1 | 1:1.2TH/s Coin Miner (AMT1200) x1 | |
| 1233 | S.R. | 12/28/2013 | 12/30/2014 | | | | 4,259 | 94536 | San Francisco | CA | United States | 1 | 1:500 GH/s Coin Miner (AMT550) x1 | |
| 1227 | Z.C. | 12/28/2013 | 1/3/2014 | | | | 12,128 | 92807 | Anaheim | CA | United States | 2 | 2:1.2TH/s Coin Miner (AMT1200) x2 | |
| 1562 | N.C. | 2/25/2014 | 2/26/2014 | | | | 11,358 | 91786 | Upland | CA | United States | 2 | 2:1.2TH/s Coin Miner (AMT1200) x2 | |
| 1356 | I.C. | 1/20/2014 | 1/30/2014 | | | | 6,089 | 96064 | Montague | CA | United States | 1 | 1:1.2TH/s Coin Miner (AMT1200) x1 | |
| 647 | K.D. | 11/12/2013 | 11/12/2013 | | | | 5,959 | 92845 | Garden Grove | CA | United States | 1 | 1:AMT1200|15799 | |
| 907 | J.H. | 12/3/2013 | 12/31/2013 | | | | 11,688 | 92673 | San Clemente | CA | United States | 2 | 2:AMT1200|211998 | |
| 1361 | P.K. | 1/15/2014 | 2/3/2014 | | | | 6,089 | 90815 | Long beach | CA | United States | 1 | 1:1.2TH/s Coin Miner (AMT1200) x1 | |
| 1391 | R.X. | 12/27/2013 | 12/27/2013 | | | | 6,159 | 94043 | Mountain View | CA | United States | 1 | 1:1.2TH/s Coin Miner (AMT1200) x1 | |
| 1243 | J.K. | 1/4/2014 | 1/4/2014 | | | | 6,155 | 95823 | Sacramento | CA | United States | 1 | 1:1.2TH/s Coin Miner (AMT1200) x1 | |
| 1213 | J.L. | 1/2/2014 | 1/8/2014 | | | parleto credit union | 6,159 | 95136 | San Jose | CA | United States | 1 | 1:1.2TH/s Coin Miner (AMT1200) x1 | |
| 1883 | S.L. | 1/24/2014 | 1/27/2014 | | | | 6,089 | 94015 | Daly City | CA | United States | 1 | 1:1.2TH/s Coin Miner (AMT1200) x1 | |
| 601 | E.L. | 11/15/2013 | 11/15/2013 | | | | 5,955 | 95515-2269 | Kickelsville | CA | United States | 1 | 1:AMT1200|15799 | |
| 1216 | B.N. | 12/30/2013 | 12/30/2013 | | | | 6,089 | 95903 | Beale AFB | CA | United States | 1 | 1:1.2TH/s Coin Miner (AMT1200) x1 | |
| 1213 | G.P. | 12/29/2013 | 10/31/2013 | | | paid byAT.JTVGN PALOZPAN | 6,089 | 91401 | Van Nuys | CA | United States | 1 | 1:1.2TH/s Coin Miner (AMT1200) x1 | |
| 515 | N.P. | 10/14/2013 | 11/4/2013 | | | | 5,634 | 92880 | Corona | CA | United States | 1 | 1:AMT1200|15299 | |
| 527 | N.P. | 10/15/2013 | 11/4/2013 | | | | 5,186 | 92880 | Corona | CA | United States | 1 | 1:AMT1200|15299 | |
| 1638??/700 | N.P. | 2/1/2014 | 2/1/2014 | | | 5 x 24ths / paid 62 bitcoins | 50,000 | 92880 | Corona | CA | United States | 0 | AMT1200|15299 | 0 |
| 1434 | A.T. | 3/4/2014 | 3/5/2014 | | | | 5,759 | 94588 | Pleasanton | CA | United States | 1 | 1:1.2TH/s Coin Miner (AMT1200) x1 | |
| 827 | B.V. | 12/2/2013 | 12/3/2013 | | | | 6,159 | 93313 | Bakersfield | CA | United States | 1 | 1:AMT1200|15999 | |
| 1301 | D.G. | 12/27/2013 | 12/30/2013 | | | | 6,159 | 81623 | carbondale | CO | United States | 1 | 1:AMT1200|15999 | |
| 1367 | F.N. | 2/13/2014 | 2/19/2014 | | | | 5,689 | 6901 | Avon | CT | United States | 1 | 1:1.2TH/s Coin Miner (AMT1200) x1 | |
| 691 | E.T. | 11/18/2013 | 12/18/2013 | | | | 5,799 | 6320 | New London | CT | United States | 1 | 2:AMT1200|15799 | |
| 1332 | W.D. | 1/14/2014 | 1/16/2014 | | | | 5,999 | 19703 | Claymont | DE | United States | 1 | 1:1.2TH/s Coin Miner (AMT1200) x1 | |
| 1399 | M.A. | 1/28/2014 | 1/30/2014 | | | Technologies | 6,089 | 33131 | Miami | FL | United States | 1 | 1:1.2TH/s Coin Miner (AMT1200) x1 | |
| 956 | E.B. | 12/11/2013 | 12/20/2013 | | | | 6,089 | 33179 | miami | FL | United States | 1 | 1:AMT1200|15999 | |
| 636 | E.B. | 11/12/2013 | 11/12/2013 | | | | 12,158 | 33158 | | FL | United States | 2 | 2:AMT1200|211998 | |
| 880 | J.B. | 12/4/2013 | 12/4/2013 | | | | 12,158 | 32076 | Coral Springs | FL | United States | 2 | 2:AMT1200|211998 | |
| 938 | I.H. | 12/6/2013 | 12/5/2013 | | | | 6,159 | 32404 | Panama City | FL | United States | 1 | 1:AMT1200|15999 | |
| 1035 | J.M. | 12/12/2013 | 12/17/2013 | | | paid for his brother too order #1330 | 6,159 | 33040 | Key West | FL | United States | 1 | 1:AMT1200|15999 | |
| 1325 | N.N. | 1/13/2014 | 1/13/2014 | | | | 6,159 | 33301 | Fort Lauderdale | FL | United States | 1 | 1:1.2TH/s Coin Miner (AMT1200) x1 | |
| 750 | J.P. | 11/25/2013 | 2/25/2013 | | | | 1,535 | 34983 | Port St. Lucie | FL | United States | 1 | 1:AMT66|11|11445 | |

ALL-USA-ONLY-DATA

| order number | Customer | order date | payment date / date format dd.mm.yyyy | Shipping date | Shipping Method Used | other comment | order_total | shipping postcode | shipping_city | shipping state | shipping country | Number of miners / order_item | Unique Customer Count |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 750-1 | A.P. | 7/19/2014 | 7/19/2014 | | | upgraded to AMT1.2 | $ 5,319 | 34983 | Port St Lucie | FL | United States | 1.AMT[6]111445 / 1.AMT1200)x1 | 0 |
| 847 | G.B. | 12/13/2013 | 12/15/2013 | delivered | | | $ 7,704 | 32920 | Melbourne | FL | United States | 1.AMT1200)115999 / 1.AMT1200)115999 | 1 |
| 870 | Thomas Unbarse | 12/4/2013 | 12/4/2013 | | | | $ 18,157 | 32277 | Jacksonville | FL | United States | 3.AMT1200)3115997 / 3.AMT1200)3115997 | 1 |
| 1647 | J.W. | 3/13/2014 | 3/17/2014 | | | appears as DEPOSIT | $ 5,689 | 33904 | CAPE CORAL | FL | United States | 1.127m/s Coin Miner (AMT1200) x1 | 3 |
| 1426 | S.W. | 1/30/2014 | 1/30/2014 | | | | $ 5,689 | 33487 | Boca Raton | FL | United States | 1.127m/s Coin Miner (AMT1200) x1 | 1 |
| 1085 | K.D. | 12/18/2013 | 12/18/2013 | | | | $ 6,159 | 30265 | Newnan | GA | United States | 1.AMT1200)115999 | 1 |
| 659 | K.W. | 1/13/2014 | 11/13/2013 | | | | $ 5,959 | 30305 | Alpharetta | GA | United States | 1.AMT1200)115799 | 1 |
| 1346 | R.B. | 1/16/2014 | 1/17/2014 | | | | $ 6,159 | 60625 | Chicago | GA | United States | 1.127m/s Coin Miner (AMT1200) x1 | 1 |
| 901 | A.C. | 12/6/2013 | 12/23/2013 | | | | $ 6,159 | 60640 | Chicago | IL | United States | 1.AMT1200)115999 | 1 |
| 794 | T.H. | 12/12/2013 | 12/12/2013 | | | | $ 6,159 | 60051 | Schaumburg | IL | United States | 1.AMT1200)115999 | 1 |
| 537 | J.M. | 10/22/2013 | 10/28/2013 | | | Refunded | $ 5,299 | 60611 | Chicago | IL | United States | 1.AMT1200)115299 | 1 |
| 1388 | J.N. | 12/26/2013 | 12/26/2013 | | | took over Tom Wilson's order | $ 6,159 | 60610 | Chicago | IL | United States | 1.127m/s Coin Miner (AMT1200) x1 | 1 |
| 1196-1 | J.N. | | | | | Jeffery Norman took over Tom Wilson's order (refunded) | | | | | | | 0 |
| 1196 | T.W. | 12/27/2013 | 2/14/2014 | | | | $ 6,089 | 60610 | Chicago | IL | United States | 1.127m/s Coin Miner (AMT1200) x1 | 1 |
| 1326 | P.W. | 1/23/2014 | 2/3/2014 | | | | $ 6,089 | 60148 | Lombard | IL | United States | 1.127m/s Coin Miner (AMT1200) x1 | 1 |
| 1317 | M.B. | 12/19/2013 | 1/2/2014 | | | | $ 6,089 | 46514 | Elkhart | IN | United States | 1.127m/s Coin Miner (AMT1200) x1 | 1 |
| 1376 | F.M. | 1/23/2014 | 1/27/2014 | | | | $ 5,999 | 46268 | Indianapolis | IN | United States | 1.127m/s Coin Miner (AMT1200) x1 | 3 |
| 1429 | M.R. | 1/24/2014 | 1/30/2014 | | | | $ 11,756 | 47906 | West Lafayette | IN | United States | 2.AMT1200)211598 | 1 |
| 877 | B.V. | 12/4/2013 | 12/4/2013 | | | | $ 6,159 | 46037 | Noblesville | IN | United States | 1.AMT1200)115998 | 1 |
| 1127 | M.V. | 12/21/2013 | 12/21/2013 | | | | $ 6,159 | 66214 | Overland Park | KS | United States | 1.AMT1200)115999 | 3 |
| 1505 | A.A. | 2/20/2014 | 2/21/2014 | | | | $ 5,689 | 2472 | Watertown | MA | United States | 1.127m/s Coin Miner (AMT1200) x1 | 1 |
| 1242 | B.C. | 1/6/2014 | 1/18/2014 | | | intlaw received on 22.01.2014 | $ 12,158 | 2116 | Boston | MA | United States | 2.127m/s Coin Miner (AMT1200) x2 | 3 |
| 1485 | P.M. | 2/13/2014 | 2/14/2014 | | | received $734 | $ 5,759 | 2375 | South Boston | MA | United States | 1.127m/s Coin Miner (AMT1200) x1 | 1 |
| 1215 | T.O. | 12/29/2013 | 12/31/2013 | | | | $ 6,045 | 2155 | Medford | MA | United States | 1.127m/s Coin Miner (AMT1200) x1 | 1 |
| 1051 | .S. | 12/17/2013 | 12/18/2013 | | | | $ 11,998 | 20880 | Washington Grove | MD | United States | 2.AMT1200)211998 | 2 |
| 1484 | D.W. | 2/12/2014 | 2/18/2014 | | | | $ 22,396 | 21701 | Frederick | MD | United States | 4.127m/s Coin Miner (AMT1200) x4 | 1 |
| 1019 | N.L. | 12/13/2013 | 12/31/2013 | | | | $ 5,999 | 4072 | Saco | ME | United States | 1.AMT1200)115999 | 0 |
| 1053 | N.L. | 12/16/2013 | 12/18/2013 | | | | $ 5,999 | 4072 | Saco | ME | United States | 1.AMT1200)115999 | 1 |
| 1119 | N.L. | 12/20/2013 | 12/20/2013 | | | | $ 5,999 | 4072 | Saco | ME | United States | 1.127m/s Coin Miner (AMT1200) x1 | 1 |
| 1137 | J.M. | 1/28/2014 | 1/30/2014 | | | | $ 6,159 | 48178 | South Lyon | MI | United States | 1.127m/s Coin Miner (AMT1200) x1 | 3 |
| 2056 | D.P. | 12/13/2013 | 12/13/2013 | | | | $ 6,159 | 48390 | Wolverine Lake | MI | United States | 1.AMT1200)115999 | 1 |
| 1380 | R.R. | 1/28/2014 | 1/28/2014 | | | | $ 6,159 | 48173 | Brownstown | MI | United States | 1.127m/s Coin Miner (AMT1200) x1 | 1 |
| 1378 | V.Z. | 1/28/2014 | 1/30/2014 | | | | $ 6,159 | 48375 | Novi | MI | United States | 1.127m/s Coin Miner (AMT1200) x1 | 3 |
| 1047 | D.B. | 12/13/2013 | 12/13/2013 | | | | $ 6,299 | 63038 | Wildwood | MO | United States | 1.127m/s Coin Miner (AMT1200) x1 | 1 |
| 1275 | N.G. | 1/7/2014 | 1/20/2014 | | | | $ 12,158 | 63105 | Clayton | MO | United States | 2.127m/s Coin Miner (AMT1200) x2 | 2 |
| 862 | A.F. | 12/4/2013 | 12/7/2013 | | | paid by Kate F | $ 12,088 | 28278-2500 | Charlotte | NC | United States | 2.AMT1200)211998 | 1 |
| 610 | Craig Greer / D.R. | 11/7/2013 | 11/20/2013 | | | | $ 5,959 | 28078 | Huntersville | NC | United States | 1.AMT1200)115299 | 1 |
| 1035 | D.R. | 12/13/2013 | 12/18/2013 | | | | $ 18,157 | 28203 | Charlotte | NC | United States | 3.AMT1200)3115997 | 1 |
| 1287 | T.B. | 1/2/2014 | 1/8/2014 | | | S&C Federal Credit Union | $ 6,089 | 68173 | Bellevue | NE | United States | 1.127m/s Coin Miner (AMT1200) x1 | 3 |
| 1635 | C.H. | 3/7/2014 | 3/11/2014 | | | | $ 5,759 | 68021 | Elkhorn | NE | United States | 1.AMT1200)115999 | 1 |
| 565 | S.H. | 11/17/2013 | 11/21/2013 | | | | $ 2,589 | 68147 | Bellevue | NE | United States | 1.AMT1200)112499 | 1 |
| 1304 | S.P. | 1/14/2014 | 1/27/2014 | | | | $ 6,159 | 3851 | Milton | NH | United States | 1.127m/s Coin Miner (AMT1200) x1 | 3 |
| 518 | A.B. | 10/14/2013 | 11/4/2013 | | | | $ 4,924 | 8807 | Bridgewater | NJ | United States | 1.AMT1200)115299 | 1 |
| 1042 | .S. | 12/12/2013 | 12/31/2013 | | | | $ 5,999 | 8879 | Lawrence Harbor | NJ | United States | 1.AMT1200)115999 | 1 |
| 2451 | R.M. | 2/4/2014 | 10/14/2014 | | | | $ 5,759 | 89128 | Las Vegas | NV | United States | 1.127m/s Coin Miner (AMT1200) x1 | 3 |
| 1335 | S.C. | 1/14/2014 | 1/14/2014 | | | | $ 5,999 | 14217 | Kenmore | NY | United States | 1.127m/s Coin Miner (AMT1200) x1 | 1 |

3

ALL-USA-ONLY-DATA

| order number | Customer | order date | payment date / date format dd.mm.yyyy | Shipping Method Used | Shipping date | other comment | order_total | shipping postcode | shipping_city | shipping_state | shipping_country | Number of invoices | order_item | Unique Customer Count |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1465 | D.C. | 2/5/2014 | 2/12/2014 | | | | $5,889 | 14522 | Palmyra | NY | United States | 1 | 1.27Th/s Coin Miner (AMT1200) x1 | 1 |
| 1321 | T.H. | 12/30/2013 | 12/30/2013 | | | | $6,089 | 11787-3815 | SMITHTOWN | NY | United States | 1 | 1.27Th/s Coin Miner (AMT1200) x1 | 1 |
| 1372 | N.N. | 1/23/2014 | 1/25/2014 | | | | $6,159 | 11229 | Brooklyn | NY | United States | 1 | 1.27Th/s Coin Miner (AMT1200) x1 | 1 |
| 1381 | F.P. | 1/23/2014 | 1/29/2014 | | | Paid by Lakeshore community | $5,959 | 10010 | New York | NY | United States | 1 | 1.27Th/s Coin Miner (AMT1200) x1 | 1 |
| 600 | I.S. | 12/1/2013 | 11/23/2013 | | | | $5,389 | 14303-1709 | NIAGARA FALLS | NY | United States | 2 | AMT1200 J1S299 | 1 |
| 921 | J.T. | 10/14/2013 | 11/4/2013 | | | | $5,459 | 14559 | Spencerport NY | NY | United States | 1 | AMT1200 J1S299 | 1 |
| 607 | K.T. | 11/11/2013 | 12/11/2013 | | | | | | | | | | | |
| 1491-1 | F.T. | 2/14/2014 | 4/7/2014 | | | Martin Marketing Group | $9,999 | 14004 | Aiken | SC | United States | 2 | 2.4Th/s Coin Miner x1 | 2 |
| 1649 | R.I. | 3/14/2014 | 3/14/2014 | | | | $5,889 | 73190 | Moore | OK | United States | 1 | 1.27Th/s Coin Miner (AMT1200) x1 | 1 |
| 550 | T.C. | 10/29/2013 | 10/29/2013 | | | | $5,369 | 97471 | Roseburg | OR | United States | 1 | AMT1200 J1S299 | 1 |
| 1091 | Y.M. | 12/16/2013 | 12/16/2013 | | | | $6,159 | 97008 | Beaverton | OR | United States | 1 | AMT1200 J1S999 | 1 |
| 1437 | Q.P. | 1/21/2014 | 2/7/2014 | | | only 5674 | $5,609 | 97205 | Portland | OR | United States | 1 | 1.27Th/s Coin Miner (AMT1200) x1 | 1 |
| 1283 | J.G. | 1/9/2014 | 1/13/2014 | | | | $5,999 | 18960 | SELLERSVILLE | PA | United States | 1 | 1.27Th/s Coin Miner (AMT1200) x1 | 1 |
| 529 | G.M. | 10/20/2013 | 10/29/2013 | | | | $5,299 | 15126 | Imperial | PA | United States | 1 | AMT1200 J1S299 | 1 |
| 1266 | P.W. | 1/6/2014 | 1/9/2014 | | | | $5,999 | 16066 | Cranberry Township | PA | United States | 1 | 1.27Th/s Coin Miner (AMT1200) x1 | 1 |
| 552 | E.W. | 10/30/2013 | 10/31/2013 | | | | $5,124 | 28922 | CAMPOBELLO | SC | United States | 2 | AMT1200 J2110598 | 2 |
| 1047 | W.R. | 12/17/2013 | 12/17/2013 | | | | $6,159 | 37209 | Nashville | TN | United States | 1 | AMT1200 J1S999 | 1 |
| 636 | E.R. | 11/13/2013 | 11/13/2013 | | | | $5,599 | 38111 | Memphis | TN | United States | 1 | AMT1200 J1S799.00 | 1 |
| 899 | R.B. | 12/5/2013 | 12/5/2013 | | | | $12,158 | 78751 | Austin | TX | United States | 2 | AMT1200 J11998 | 1 |
| 1488 | A.C. | 2/13/2014 | 2/18/2014 | | | | $5,759 | 77433 | Cypress | TX | United States | 1 | 1.27Th/s Coin Miner (AMT1200) x1 | 1 |
| 726 | R.S. | 11/21/2013 | 11/24/2013 | | | | $11,788 | 75082 | Richardson | TX | United States | 2 | AMT1200 J11598 | 1 |
| 1321 | A.L. | 1/13/2014 | 1/13/2014 | | | paid by Assad | $6,159 | 77025 | Houston | TX | United States | 1 | 1.27Th/s Coin Miner (AMT1200) x1 | 1 |
| 1330 | J.L. | 1/13/2014 | 1/14/2014 | | | Jumpfred | $6,159 | 77498 | Sugar Land | TX | United States | 1 | 1.27Th/s Coin Miner (AMT1200) x1 | 1 |
| 1462 | C.K. | 2/5/2014 | 2/11/2014 | | | | $5,889 | 78620 | Dripping Springs | TX | United States | 1 | 1.27Th/s Coin Miner (AMT1200) x1 | 1 |
| 1467 | M.L. | 2/16/2014 | 2/22/2014 | | | | $6,159 | 78213 | San Antonio | TX | United States | 1 | 1.27Th/s Coin Miner (AMT1200) x1 | 1 |
| 1395-1 | M.L. | 1/28/2014 | 2/20/2014 | | | upgraded to AMT 1.2 | $1,600 | 78213 | San Antonio | TX | United States | | | 0 |
| 1395 | M.L. | 1/28/2014 | 11/25/2013 | | | upgraded to AMT 1.2 | $4,285 | 78223 | San Antonio | TX | United States | 1 | 1.520 GH/s Coin Miner (AMTS200) x1 | 0 |
| 672 | D.P. | 1/15/2013 | 11/15/2013 | | | | $4,589 | 78748 | Austin | TX | United States | 1 | AMT1200 J14499 | 1 |
| 700 | D.P. | 11/21/2013 | 11/21/2013 | | | | $5,889 | 78748 | Austin | TX | United States | 1 | AMT1200 J1S799 | 1 |
| 492 | A.P. | 10/6/2013 | 11/4/2013 | | | | $5,339 | 77598 | WEBSTER | TX | United States | 1 | AMT1200 J1S299 | 1 |
| 666 | I.R. | 11/14/2013 | 12/16/2013 | | | | $4,589 | 78753 | Austin | TX | United States | 1 | AMT1200 J14499 | 0 |
| 700 | I.R. | 11/21/2013 | 11/21/2013 | | | | $5,889 | 78753 | Austin | TX | United States | 1 | AMT1200 J1S799 | 1 |
| 1291 | W.T. | 1/10/2014 | 1/13/2014 | | | | $6,089 | 77550 | Galveston | TX | United States | 1 | 1.27Th/s Coin Miner (AMT1200) x1 | 1 |
| 1646 | S.C. | 3/13/2014 | 3/17/2014 | | | | $10,359 | 84604 | Orem | UT | United States | 1 | AMT 2.4Th/s Bitcoin Miner (AMT24THS) x1 | 1 |
| 1430 | M.I. | 1/30/2014 | 1/30/2014 | | | | $5,759 | 84057 | Orem | UT | United States | 1 | 1.27Th/s Coin Miner (AMT1200) x1 | 1 |
| 1072 | [name] | 12/14/2013 | 12/13/2013 | | | | $6,089 | 84604 | Provo | UT | United States | 1 | AMT1200 J1S999 | 1 |
| 737 | M.B. | 1/23/2013 | 12/2/2013 | | | | $4,659 | 22554-2120 | Stafford | VA | United States | 1 | AMT1200 J14499 | 0 |
| 779 | M.B. | 11/24/2013 | 12/2/2013 | | | | $5,969 | 22554-2120 | Stafford | VA | United States | 1 | AMT1200 J1S799 | 1 |
| 1?? | M.B. | 2/20/2013 | 12/31/2013 | | | | $6,159 | 22554-2120 | Stafford | VA | United States | 1 | 1.27Th/s Coin Miner (AMT1200) x1 | 0 |
| 1218 | F.C. | 12/30/2013 | 1/8/2014 | | | | $4,689 | 20171 | Herndon | VA | United States | 1 | 1.520 GH/s Coin Miner (AMTS200) x1 | 1 |

4

All-USA-ONLY DATA

| order number | Customer | order date | payment date / date format dd.mm.yyyy | Shipping Method Used | Shipping date | other comment | order_total | shipping postcode | shipping city | shipping state | shipping country | Number of miners | order_item | Unique Customer Count |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1136 | N.G. | 12/23/2013 | 1/8/2014 | | | | $6,159 | 99037 | Veradale | WA | United States | 1 | 1.2TH/s Coin Miner (AMT13200) x1 | 1 |
| 699 | D.M. | 11/19/2013 | 12/2/2013 | | | | $5,686 | 98822 | Chelan | WA | United States | 1 | AMT1200\|1\|5799 | 1 |
| 1502 | D.S. | 2/19/2014 | 2/20/2014 | | | plus order 1510 | $11,338 | 99019 | Liberty Lake | WA | United States | 2 | 1.2TH/s Coin Miner (AMT13200) x 2 | 3 |
| 1510 | D.S. | 2/20/2014 | 2/20/2014 | | | plus order 1502 | $30,158 | 99019 | Liberty Lake | WA | United States | 2 | AMT1 3.2Th4 Bitcoin Miner x2 | 0 |
| 696 | R.S. | 11/15/2013 | 12/7/2013 | | | | $5,889 | 98922 | Cle Elum | WA | United States | 1 | AMT1200\|1\|5799 | 0 |
| 716 | R.S. | 11/22/2013 | 12/7/2013 | | | | $11,688 | 98922 | Cle Elum | WA | United States | 2 | AMT1200\|2\|11598 | 0 |
| 1443 | K.F. | 1/31/2014 | 2/4/2014 | | | | $5,799 | 53168 | Salem | WI | United States | 1 | 1.2TH/s Coin Miner (AMT13200) x1 | 1 |
| 1456 | K.F. | 2/3/2014 | 2/4/2014 | | | Refunded | $2,659 | 53168 | Salem | WI | United States | 0 | AMT 180 GHz Bitcoin Miner (AMT1925) x1 | 0 |
| 1429 | A.G. | 1/30/2014 | 2/3/2014 | | | | $5,759 | 54981 | Wawpaca | WI | United States | 1 | 1.2TH/s Coin Miner (AMT13200) x1 | 1 |
| 1401 | M.S. | 1/29/2014 | 1/26/2014 | | | | $5,680 | 54982 | Wautoma | WI | United States | 1 | 1.2TH/s Coin Miner (AMT13200) x1 | 1 |
| 1008 | D.H. | 17/12/2103 | | | | | $2,360 | 94531 | Antioch | CA | United States | 1 | AMT1261\|1\|2299 | 1 |
| 561 | R.T. | 10/31/2013 | 10/29/2013 | | | | $5,269 | 30315 | Hephzibah | GA | United States | 1 | AMT1200\|1\|5299 | 1 |
| 798 | R.T. | 11/29/2013 | 11/29/2013 | | | | $5,999 | 30815 | Hephzibah | GA | United States | 1 | AMT1200\|1\|5999 | 0 |

5

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| CRAIG LENELL, et al. | : CIVIL ACTION |
| Plaintiffs, | : |
| | : |
| v. | : 2:14-cv-01924-LDD |
| | : |
| ADVANCED MINING TECHNOLOGY, INC., et al. | : |
| Defendants. | : |

### CERTIFICATE OF SERVICE

I, Primitivo J. Cruz, Esquire, hereby certify that I have served a copy of the foregoing

Motion To Dismiss Plaintiffs' First Amended Complaint via electronic filing on this 17th day of

July, 2014.

Kimberly Donaldson Smith, Esquire
Benjamin F. Johns, Esquire
Chimicles & Tikellis LLP
361 West Lancaster Avenue
Haverford, PA 19041


**WHITE AND WILLIAMS LLP**


  s/Primitivo J. Cruz
Michael N. Onufrak
Primitivo J. Cruz
1650 Market Street
One Liberty Place, Suite 1800
Philadelphia, PA 19103-7395
215.864.7174/6865
Attorney for Defendants